MIDDLESEX BUILDERS, INC., PLAINTIFF, v. TOWNSHIP OF
OLD BRIDGE, DEFENDANT.

Tax Court of New Jersey

May 9, 1980.

*Harold A. Kuskin, Lasser, Hochman, Marcus, Guryan & Kuskin* for plaintiff.

*Louis J. Alfonso* for defendant.

ANDREW, J. T. C.

Plaintiff seeks a reduction in its property tax assessment for the tax years of 1976, 1977 and 1978 while the defendant seeks to reverse the judgments of the Middlesex County Board of Taxation (County Board) which granted a reduction from the original assessments for the tax years of 1977 and 1978.

The assessments and the action of the County Board were as follows:

| 1976 Original Assessment | | 1976 County Board Action | |
|---|---|---|---|
| Land | $ 1,863,000 | Land | $ 1,863,000 |
| Improvements | 10,847,800 | Improvements | 10,847,800 |
| Total | $12,710,800 | Total | $12,710,800 |

| 1977 Original Assessment | | 1977 County Board Action | |
|---|---|---|---|
| Land | $ 1,863,000 | Land | $ 1,863,000 |
| Improvements | 11,342,700 | Improvements | 10,847,800 |
| Total | $13,205,700 | Total | $12,710,800 |

| 1978 Original Assessment | | 1978 County Board Action | |
|---|---|---|---|
| Land | $ 1,443,000 | Land | $ 1,443,000 |
| Improvements | 11,342,700 | Improvements | 10,847,800 |
| Total | $12,785,700 | Total | $12,290,800 |

As can be seen, the assessor increased the assessment on improvements from $10,847,800 in 1976 to $11,342,700. This was done without the benefit of a revaluation or reassessment of all property within the taxing district for 1977. The County Board eliminated the increase in its 1977 judgment. Prior to 1978 a portion of the land was subdivided and was separately assessed, hence the reduction in land value as reflected in the original assessment of 1978.

At the outset, the parties stipulated that the Director of the Division of Taxation's average ratios for the tax years in question constituted the common level of assessment within the taxing district. It was agreed that the Court would apply the average of such ratios to whatever values the Court determined to be true values for the tax years in question. This would be in accord with the principles enunciated in *Feder v. City of Passaic,* 105 *N.J.Super.* 157, 251 *A.*2d 457 (App.Div.1969) and *New Brunswick v. State of N.J., Div. of Tax Appeals,* 39 *N.J.* 537, 189 *A.*2d 702 (1963) in order to achieve relative stability of assessments which is basic to sound tax assessment policy. Thus, the stipulated common level was 79.36%.

The subject of this proceeding is a garden apartment complex consisting of a total of 962 apartments. This complex, commonly known as London Terrace Apartments, is located on the east side of State Highway Route 9 near Ernston Road in Old Bridge Township. In 1976 and 1977 the site contained 89.38 acres of land but prior to 1978, a 29.6 acre parcel was subdivided, leaving 59.78 acres for the tax year of 1978. The property is identified as Block 4185, Lot 4A on the Old Bridge Township tax maps.

The improvements which were constructed during the period of 1968 to 1970 consist of 744 one–bedroom apartments and 218 two–bedroom apartments. Every apartment has a refrigerator–freezer, built–in oven and range and an individually controlled

air–conditioner. There are garages located in the basement of 125 units and there are 110 garages in detached buildings. Also located on the site is an olympic size swimming pool and wading pool.

█ It should be noted that there was no issue as to the value of the land. Both the taxpayer's appraiser and the assessor used the assessed valuation in their appraisals. The assessor did indicate, however, that the land value was greater for the years in question, but he did not substantiate this testimony and I find that the presumption of correctness of the County Board judgment as to the land value controls. *Aetna Life Insurance Co. v. City of Newark*, 10 *N.J.* 99, 105, 89 *A.*2d 385 (1952).

The taxpayer presented one appraisal expert who indicated that the primary approach to value in this particular matter was the income approach. He felt that this was the most appropriate method since "properties of this type are bought and sold in the market based on their income." In arriving at his determination of economic rent, he utilized the actual rent rolls for October 1, 1975, October 1, 1976 and October 1, 1977. He annualized each of these rent rolls by multiplying by 12 and then averaged the results. It was his opinion that the actual rents constituted economic or fair market rental for the tax years in question. From a gross annual income of $2,888,904 he deducted $86,667 for vacancy and collection loss leaving an effective rental income of $2,802,237. To this effective rental income he added average income derived from vending machines in the various laundry rooms of $26,000 and the sum of $17,091 which represented income from the swimming pool. This produced an effective gross income of $2,845,328. From this total he deducted expenses of approximately 39% of the gross income. It was his opinion that the reasonable range of operating expenses for this type of a garden apartment complex was between 30% to 42%. It should be noted that he relied on actual expenses incurred by the owner for most of the items with the exception of repairs and maintenance which he stabilized at 5%, reserves which he stabilized at 2% and management which he stabilized at 5%. He then subtracted a total expense of $1,137,-

794 leaving a net income of $1,707,534. He accepted the land value as set by the assessment of $1,443,000 and used a rate of return of 12.2%. (8.5% interest and 3.7% effective tax rate) in order to determine the rental attributable to the land which was calculated to be $176,046. This left a net income to the improvements of $1,531,488 which was capitalized at an overall rate of 14.7%. This overall rate included 8.5% for return of investment, 3.7% for the effective real estate tax rate and a recapture rate of 2.5%. The value as established by the taxpayer's expert for the improvements was $10,418,300 to which he added the land value of $1,443,000 thus producing a total value for the tax year of 1978 of $11,861,300.

As was stated previously, 29.6 acres was deleted from the 1978 assessment, therefore, in order to arrive at a determination of value for the tax years of 1976 and 1977, this 29.6 acres was valued at $14,200 per acre (which was the assessment) and added to the total value of $11,861,300 in order to arrive at an indicated value for the years of 1976 and 1977. This addition produced a value for those years of $12,281,300.

The taxpayer's expert then applied the agreed upon common level of 79.36% to arrive at the proper assessment based on his valuation for the tax years of 1976, 1977 and 1978 as follows:

| 1976–1977 | | 1978 | |
|---|---|---|---|
| Land | $ 1,478,500 | Land | $ 1,145,200 |
| Improvements | 8,268,000 | Improvements | 8,268,000 |
| Total | $ 9,746,500 | Total | $ 9,413,200 |

The assessor for the municipality testified on behalf of the taxing district. He utilized the income approach and the cost approach in his determination to value. He stated at the outset that he avoided the market approach because of existing financing on sales of comparable property, although he did indicate that "the sales seem to be fairly consistent with my appraisal."

He employed the cost approach because he felt that an investor would have some interest in what it would cost to build a

garden apartment complex. It was his opinion that an investor would consider the cost to build and if the cost to build exceeded the cost to buy, the typical investor would buy an existing complex. His indicated true value by means of the cost approach was $19,865,200 to which he applied the 1976 Director's ratio of 80.98% [1] to arrive at an indicated assessed value of $15,746,723 for the tax year of 1978.

The assessor also utilized the income approach and in so doing he used two techniques for his determination of the proper capitalization rate. He utilized the mortgage—equity theory and straight capitalization with a straight line recapture. In the assessor's estimate of economic rents, he utilized the October 1976 rent roll which he annualized to produce a gross rental income of $2,909,364. He, as did the taxpayer's expert, applied a 3% vacancy factor to arrive at an effective rental income. To this rental income he added interest income, vending machine income, pool income and income from the garages which produced an effective gross income of $2,942,602. He stabilized the expenses at 32.1% which produced a total of $944,574 which when subtracted from the effective gross income produced a net income of $1,998,028. He deducted the income attributable to the land of $158,730 giving rise to a net income to the improvements of $1,839,298 which he capitalized at a rate of 12% in accordance with the straight capitalization with straight line recapture technique. The allocation of his overall capitalization rate was interest at 7.5%, taxes at 3.5% and depreciation or recapture of 1%. This produced a value for the improvements of $15,327,483 to which he added the two land values of $420,000 and $1,443,000 producing an overall value for 1976 and 1977 of $17,190,500. To this value he applied the Director's ratio for 1976 to give an indicated assessed value of $13,920,866. In order to arrive at the value for 1978 the extra land valued at $420,000

---

[1] The use of the Director's ratio for 1976 was not in accord with the stipulated common level which was the average of the Director's ratios for each of the years in question. It should be noted that the assessor selected the highest of the three ratios.

was deducted from his true value for the previous years and the resultant estimate of value was $16,770,500 and the indicated assessed value was $13,580,750.

In the assessor's application of the mortgage equity method of arriving at a capitalization rate, he employed the same net income of $1,998,028 as previously indicated and then applied an overall capitalization rate of 12.4% to arrive at an indicated true value of $16,113,129 to which he applied the 1976 Director's ratio of 80.98% to produce an indicated assessed value of $13,048,412. The assessor opined that his overall capitalization analysis provided a realistic reflection of the market. He assumed that the capital required to purchase the subject property would come from two sources, a mortgage loan and an equity investment. He estimated a 75% mortgage at 9% for 25 years with an average holding period of 10 years. He also estimated a 25% equity investment at the same return of 9% also considering the 10 year holding period. He then proceeded to use the Ellwood Tables to arrive at a rate of 8.9% overall to which he added an effective tax rate of 3.5% to produce an overall capitalization rate of 12.4%. *Ellwood, Tables for Real Estate Appraising and Financing* (4th ed., 1977).

The mortgage equity technique is a sophisticated method of adjusting overall rates indicated by the market. This method recognizes that investors usually want the maximum mortgage obtainable with minimum cash investment in order to secure a maximum yield on a minimum downpayment. This is normally referred to as leverage. *American Institute of Real Estate Appraisers, The Appraisal of Real Estate* (7th ed. 1978), Chapter 22 at 432. The mortgage equity method also acknowledges that ownership may be short–lived and therefore income projections should be of equal short term duration. This approach should yield a value that includes the benefits of the terms of financing, the impact of leverage and the inflationary or deflationary effects on the equity investment. The overall rate used in the mortgage equity procedure is composed of a basic capitalization rate computed by a modified band of investment technique and

a plus or minus adjustment to compensate for expected depreciation or appreciation. *Ibid.*

Instead of using an interest rate on a mortgage, the appraiser uses an annual constant factor which can be obtained in the Ellwood Tables. *Ellwood, supra.* This considers the fact that an investor is paying both principal and interest in each monthly payment. A 9% interest rate on a 10 year mortgage provides a constant of 15.20 which means that 6.20% of the constant is being applied to reduce the principal balance each year. *Ellwood, supra,* at 429. The investor expects his equity to grow by the reduction of principal and by the yield on equity. An appraiser must estimate the holding period, the availability of financing to include the percentage and rate therefor and the yield rate which an investor would desire on his equity investment.

While the mortgage equity technique is a sophisticated method of capitalization its effectiveness depends on the accuracy of the holding period, equity yield rate selected and the financing assumed to be available. The basis for the assessor's selection of a 10 year holding period is not satisfactorily explained. His utilization of a 9% rate for both the mortgage portion and the equity portion of this formula is not clearly expounded. He did indicate that federal income tax advantages would accrue to investors of apartment type properties and therefore this received a good deal of consideration in his determination of a 9% return on equity investment. Values should not fluctuate based on income tax advantages or benefits available to particular investors. *Cf. Glenwood Realty Co., Inc. v. East Orange,* 78 *N.J.Super.* 67, 187 *A.*2d 602 (App.Div.1963). To allow for such benefits could result in adjacent properties of equal potential assessed differently because of tax advantages of one owner as opposed to another. *Id.* at 72, 187 *A.*2d 602.

It is difficult to understand how an equity investment which includes risk, non–liquidity and the added burden of management would produce a return no greater than that obtainable from a first mortgage. L. W. Ellwood, a noted expert in the

appraisal field and whose tables the assessor relied upon has indicated, "Since the characteristics of an equity investment includes risk and non–liquidity, together with the added burden of management, an increment above that obtainable from a first mortgage must be necessary to attract the buyer to the equity position." *Ellwood, "Appraisal for Mortgage Loan Purposes", Friedman, Encyclopedia of Real Estate Appraising,* 1102 (3rd ed. 1978).

This Court will disregard the use by the assessor of the mortgage equity concept because there is no support in the record for the utilization of a 9% return for the equity portion of the formula and a 9% return for the mortgage portion of the method. Secondly, it is unacceptable because the assessor failed to demonstrate that actual investors would use this method to determine value. The Supreme Court of New Jersey has indicated that ". . . it is not for the trier of facts to decide abstractly what return an investor should want; the inquiry relates to what investors in property of this kind *in fact* do demand and do obtain in deals with willing sellers." *New Brunswick v. State of N. J., Div. of Tax Appeals,* 39 *N.J.* 537, 551, 189 *A.*2d 702, 709 (1963). This is not to say, however, that the mortgage equity technique is not an acceptable method of arriving at a capitalization rate. However, until more persuasive proofs are adduced as to what investors do demand and the manner in which such demands can be calculated, it is felt that the traditional straight capitalization with straight line recapture is a more reliable method of value estimation.

It has been stated on numerous occasions that there is no rigid rule nor particular formula to be utilized in order to determine the fair value of real property. It depends on the particular facts in the matter and the opinions of the appraisal experts. However, in a given case one approach to value may predominate. *New Brunswick, supra,* at 534, 189 *A.*2d 702. I find that the most persuasive approach in the present matter is the income approach. The cost of construction, i. e., the cost of the bricks and mortar is of little or no importance to a prospective

purchaser as his chief concern is with the income that he can expect to receive. The fact that there is very little, if no construction of garden apartment projects means little to an investor if the property he intends to purchase cannot produce rentals adequate to justify the price demanded by the seller. *Parkview Village Associates v. Borough of Collingswood,* 62 *N.J.* 21, 297 *A.*2d 842 (1972). The logical justification for the income approach to value is the

". . . common knowledge that a prospective investor in realty expects a fair return upon any investment he makes, and, before investing, studies the income history of the property and considers its income–producing potentiality." Annotation, "Income or rental value as a factor in evaluation of real property for purposes of taxation," 96 A.L.R.2d 666, 669 (1964).

For the reasons cited, the Court will give little weight to the cost approach utilized by the assessor in his determination of value. In adopting the income approach the Court is mindful of the care with which the income approach must be used and the admonition to check the answer produced thereby against all available data. *New Brunswick, supra,* 39 *N.J.* at 544, 189 *A.*2d 702.

In the income approach to value, the experts differed in their estimates of gross income, total expenses and in the capitalization rate. They did, however, agree that the vacancy factor should be 3% of gross rental income. Since there was no dispute as to the actual rentals constituting economic rentals, I will adopt the October 1, 1976 rent roll annualized (the mean assessment date) as the gross rent potential. I have adopted the October 1, 1976 rent roll annualized as opposed to an averaging of the 3 years under consideration because I find this sum to be more indicative of an income stream to be anticipated in the future. This annualized rental was $2,929,008 and an uncontroverted 3% allowance shall be applied to this for vacancy and collection losses.

The assessor indicated other income for interest on security deposits. There is sufficient support in the record for an addition of $3,600 for interest income representing 1% of the security deposits which by statute the landlord is permitted to retain for

administration expenses. *N.J.S.A.* 46:8–19. I will also add the income from the vending machines located in the laundry rooms. I will allow $26,000 for this income since it is the average income actually received for the tax years. I will also allow the average of the income received from the operation of the swimming pool which is $17,091.

There is no support in the record for the 2% pool income that the assessor has utilized in his income approach. His justification for the 2% estimate was that "in the summer the pool is loaded with people." There was no basis for the additional income for garages as shown by the assessor in his appraisal. I find that the garage rental was for the most part included with the existing rental structure except for approximately $100 per month received from persons other than tenants. Therefore, I will add an additional $1200 to income.

With regard to expenses, the Court finds that the operating expenses assigned by the taxpayer's expert are slightly generous at 39% of gross income. However, as previously stated, the taxpayer's expert utilized actual average costs over the three tax years for all of the expenses with the exception of three items: (1) repairs and maintenance, (2) reserves and (3) management. For these items he utilized percentages of gross income and effective gross income. I find the percentage estimates of the assessor relative to these items more persuasive because he utilized stabilized expenses that were based on the assessor's experience and knowledge of expense calculations for these items generally in the taxing district for garden apartment complexes. The difference between the estimates of the two experts was 3% relative to these three items. Therefore, I will utilize expenses of 36% of gross income (39% utilized by the taxpayer's appraiser less 3% differential).

With regard to the capitalization rate, the experts differed by 2.7%. I find that I cannot accept the capitalization rate of either expert as constituting a fair rate for return and recapture. I find that a reasonable return during this time period was 8%. I base this finding on a consideration of the rates of

return available on alternative investments during the applicable periods. I find that the recapture rate should be 2% (50 year economic life) in view of the fact that this apartment complex was only 5 years old as of the first assessment date and also in consideration of the condition of and maintenance on the subject property. Therefore, a capitalization rate of 10% will be adopted. To this capitalization rate shall be added taxes at the effective tax rate of 3.7%. This is in accordance with the stipulation of the parties wherein they agreed that the average of the Director's ratios constitutes the common level of assessment within the taxing district during the three years in question.

I have already indicated that the value of the land will be in accordance with the judgment of the County Board since there was no evidence which would overcome the presumption of correctness as to the land values.

Reconstructing the income approach in accordance with the foregoing the Court finds as follows:

| | |
|---|---:|
| Estimated Economic Rental (October 1, 1976 rent roll $244,084 x 12) | $ 2,929,008 |
| Less Vacancy and Collection loss at 3% | 87,870 |
| Effective Rental Income | $ 2,841,138 |
| Income from Laundry Room Concessions | 26,000 |
| Income from Swimming Pool | 17,091 |
| Interest Income on Security deposits – 1% of 1½ months security deposits | 3,600 |
| Garage income from non-tenants | 1,200 |
| Effective Gross Income | $ 2,889,029 |
| Less operating expenses at 36% of gross economic rental | 1,054,442 |
| Net Income | $ 1,834,587 |
| Deduct income to land ($1,443,000 x 11.7%) (8% return + 3.7% tax) | 168,831 |
| Net Income to Improvements | $ 1,665,756 |

| | |
|---|---|
| $1,665,756 capitalized at 13.7% (8% return, 2% recapture and 3.7% tax) | $12,158,800 |
| Add value of land for 1978 | 1,443,000 |
| Value for 1978 | $13,601,800 |
| Add value of additional land for 1976 and 1977 | 420,000 |
| Value for 1976 and 1977 | $14,021,800 |

Pursuant to the stipulation of the parties the Director's average ratios averaged for the three tax years in question will be applied to the true value determination. Applying this ratio of 79.36% to the true value, I will direct the entry of judgments by the Clerk of the Tax Court as follows:

| 1976 and 1977 | | 1978 | |
|---|---|---|---|
| Land | $ 1,478,500 | Land | $ 1,145,200 |
| Improvements | 9,649,200 | Improvements | 9,649,200 |
| Total | $11,127,700 | Total | $10,794,400 |