GLEN WALL ASSOCIATES, PLAINTIFF-APPELLANT, v. TOWNSHIP OF WALL, DEFENDANT-RESPONDENT.

Argued January 7, 1985—Decided May 9, 1985.

266

*Alan R. Hammer* argued the cause for appellant (*Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone,* attorneys; *Alan R. Hammer* and *Michael Pesce,* of counsel; *Michael Pesce,* on the brief).

*William P. Gilroy* argued the cause for respondent (*Mangini, Gilroy, Cramer & McLaughlin,* attorneys; *Marie C. Hanley,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

At issue here is the 1980 real property tax assessment of a garden apartment development located in Wall Township. The appeal concerns the issues involved in valuing a commercial building under the building residual technique as an application of the income approach to value (building residual technique). Specifically, we review the Tax Court's decision, which rejected the taxpayer's expert's (1) use of the assessed value of the land divided by the Chapter 123 ratio to determine the market value of the land, (2) use of stabilized actual rent to determine economic rent, and (3) use of rates of return on alternative investments to determine the capitalization rate. In addition, we examine whether the Tax Court should have considered the sale of the property within three months of the assessment date as an indicator of its value. Subsumed in these issues are the practical and realistic ends to which the Tax Court should expect an expert to go to support his opinion, in view of the costs to the parties and the judicial system.

The original assessment of the Glen Wall Heights Garden Apartment Development for the tax year at issue was:

| | |
|---|---|
| Land | $102,300 |
| Improvements | 642,300 |
| Total | $744,600 |

The property consists of approximately 6.5 acres, upon which five two-story brick and frame garden apartment buildings have been constructed. The buildings, which were constructed in the early 1960's,[1] are generally in good condition and the neighborhood has other similar garden apartment developments. The property has no garages but there is ample open parking on the premises.

The complex contains 78 units; 58 apartments have 3½ rooms and 20 have 4½. In January of 1980 the monthly rents ranged from $219 to $275. As of October 1, 1979, the critical assessing date, each tenant had a one-year lease, was provided with heat, water, and cooking gas, but paid for his own electricity. Laundry equipment was provided on the premises on a concession basis. There was no rent control in Wall Township.

Glen Wall Associates (Glen Wall) acquired the property on December 20, 1979 for $1,375,000. The purchase price consisted of a cash payment of $323,000, the assumption of a six-percent mortgage of $352,000, and a purchase money mortgage of $700,000 at six and one-half percent which escalates to ten percent by 1987. Neither mortgage contained a personal guarantee of the purchaser.

After unsuccessfully challenging the assessment of its property before the Monmouth County Board of Taxation (Board), Glen Wall filed a complaint with the Tax Court seeking review of the Board's judgment. The Tax Court affirmed the original assessment. *Glen Wall Assocs. v. Wall Township,* 6 *N.J.Tax* 24 (1983). The Appellate Division affirmed substantially for

---

[1]According to the Tax Court, the development was built in 1962, although one of the experts' reports indicates that it was built in 1964, and the other expert testified that it was built around 1963 or 1964.

the reasons stated in the Tax Court opinion. 6 *N.J.Tax* 448 (N.J.Super.A.D.1984). We granted the taxpayer's petition for certification. 97 *N.J.* 661 (1984).

I

In challenging the Township's assessment Glen Wall's expert used the building residual technique to arrive at a market value of the property in 1980 of $918,000, and an assessed value of $468,200. The building residual technique is an acceptable method of appraising income-producing property. *Fort Lee v. Hudson Terrace Apartments*, 175 *N.J.Super.* 221 (App.Div.1980), certif. den., 85 *N.J.* 459 (1981); *Middlesex Builders v. Township of Old Bridge*, 1 *N.J.Tax* 305 (1980); American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 42, 50 (8th ed. 1983). Under this technique the value of the land is ascertained and a portion of the net operating income of the property is attributed to it. The residual income that is attributable to the improvements is capitalized and a value is determined for the improvements. The value thus determined for the improvements is added to the land value and a total value for the property is ascertained. *Glen Wall Assocs., supra*, 6 *N.J.Tax* at 28–29 (citing American Institute of Real Estate Appraisers, *The Appraisal of Real Estate*, 405–06 (7th ed. 1978). Specifically, the taxpayer's expert applied the building residual technique as follows:

1. He determined the market value of the land to be $200,000 (he accepted Wall Township's assessment of the land at $102,300 and divided it by the Chapter 123 ratio [2] of 51%);

2. He ascribed $24,940 of the net operating income of $132,426 to the land by setting a capitalization rate for the land of 12.47 (10% return + 2.47% effective tax rate);

3. He attributed the remaining income of $107,486 to the improvements;

---

[2]The "Chapter 123 ratio" is the average ratio of assessed value to market value of all property in a town or tax district. *N.J.S.A.* 54:51A–6, formerly *N.J.S.A.* 54:2–40.4; *Murnick v. City of Asbury Park*, 95 *N.J.* 452 (1984).

4. He capitalized the income earned by the improvements at 14.97% (10% return + 2.50% recapture + 2.47% effective tax rate = 14.97%) to set their market value at $718,000;

5. He added the market value of the improvements to the market value of the land to arrive at a market value for the entire property of $918,000; and

6. He multiplied the market value of the property by the Chapter 123 ratio of 51% to arrive at an assessment of $468,200.

In valuing the property the Township's expert utilized the economic approach, supported by comparison sales. He arrived at a market value as of October 1, 1979 of $1,326,500. The Township's assessment of $744,600, 56% of value, exceeds the 1980 Chapter 123 ratio of 51% but is within Chapter 123 limits.

## II

In applying the building residual technique an expert must first determine the market value of the land. As noted, the taxpayer's expert determined the market value of the land by accepting the land assessment of $102,300 and dividing that assessment by 51%, the Chapter 123 ratio.[3]

The Tax Court held that "it is not acceptable nor appropriate to divide the land assessment by the Chapter 123 ratio to determine the land value. *Brick Assocs. v. Brick Township.*, 4 *N.J.Tax* 510 (Tax Ct.1982). Such a methodology for valuation is not a substitute for proper appraising practice." *Glen Wall Assocs., supra*, 6 *N.J.Tax* at 29. Thus the Tax Court held that an expert, in utilizing the building residual technique, may not challenge only part of an assessment, but must reject it entirely and provide his own independent appraisal.

The Tax Court's holding is contrary to *525 Realty Holding Co. v. Hasbrouck Heights*, 3 *N.J.Tax* 206 (1981) and *Middlesex Builders v. Township of Old Bridge*, 1 *N.J.Tax* 305 (1980). These cases both involve an expert's valuation of a garden apartment complex by the building residual method. In both

---

[3]$102,300 divided by 51% equals 200,588, which was rounded off to $200,000.

cases the Tax Court permitted use of the assessed value of the land in the application of the building residual technique. In *Middlesex Builders* the court held that the value of the land would be "in accordance with the judgment of the County Board since there was no evidence which would overcome the presumption of correctness as to the land value." *Middlesex Builders, supra,* 1 *N.J.Tax* at 316. In *525 Realty Holding Co., supra,* 3 *N.J.Tax* 206, in computing true value the Tax Court attributed a portion of the total income to the land by dividing the land assessment ($85,500.00) by the applicable ratio (43%) to arrive at a true value of the land of $198,800. *Id.* at 216. This is precisely the methodology utilized in this case by the taxpayer's expert.

We accept the taxpayer's expert's methodology, as approved in *Middlesex Builders* and *525 Realty Holding Co.,* and reject the Tax Court's holding that the expert's use of the assessed value does not constitute sufficient supportable evidence of the value of the land. It is well established that there exists a presumption in favor of a tax assessment made by the local taxing authority. This presumption can be overcome only by the presentation by either party of sufficient competent evidence. It has not been argued that the Township produced sufficient evidence to overcome the presumption. Absent the introduction of such evidence the assessment stands. *Aetna Life Ins. Co. v. Newark,* 10 *N.J.* 99, 105 (1952); *Riverview Gardens v. North Arlington,* 9 *N.J.* 167, 174–75 (1952).

Not only is there a lack of authority for rejecting an expert's use of the assessed value of the land in applying the building residual technique, but also common sense dictates that such an approach be accepted. If a taxpayer does not wish to contest part of a township's assessment, he should be able to concede that fact rather than be forced to litigate an issue upon which the parties have agreed. To force the taxpayer to produce expert evidence on this point would waste the parties' and the judicial system's time and money.

■■ Accordingly, we hold that in applying the building residual technique the taxpayer's expert properly relied on the assessed value of the land, while challenging the assessed value of the improvements. Moreover, the assessed value of the land, adjusted by the Chapter 123 ratio, furnishes sufficient and competent evidence of the land's market value.

### III

Under the building residual technique, after determining the market value of the land, the expert determines the net operating income of the property. In this case, the primary factor in calculating the net operating income is the rent derived from the property.

■ In calculating the net operating income, the fair rental value, rather than the actual rent payable under an existing lease, must control. *New Brunswick v. State of N.J. Div. of Tax Appeals*, 39 *N.J.* 537 (1963). As this Court held in *Parkview Village Assocs. v. Borough of Collingswood*, 62 *N.J.* 21, 29–30 (1972):

It is of course settled that gross rental income for purposes of applying the capitalized income approach to valuation of property is to be taken at "fair rental value," professionally termed "economic" rent or income, if that differs from current actual rental. *New Brunswick v. State of N.J.Div. of Tax Appeals, supra* (39 *N.J.* at 544); *American Institute of Real Estate Appraisers, The Appraisal of Real Estate* (1967), p. 227 *et seq.; International Association of Assessing Officers, Assessing and the Appraisal Process* (4 ed. 1972), pp. 82, 172; *Kahn, Case, Schimmel, Real Estate Appraisal and Investment* (1963), p. 103 *et seq.; Ring, The Valuation of Real Estate* (1970), p. 208. However, actual income is a significant probative factor in the inquiry as to economic income.

The actual rent roll as of October 1, 1979, the critical assessing date for the 1980 assessment, was unavailable to taxpayer's expert because taxpayer did not purchase the property until December 20, 1979. The expert therefore utilized the rent roll in effect on January 1, 1980 of $18,863. He then "stabilized" this rent by increasing the contract rent by $1,047 per month for those apartments with leases due to expire shortly after the assessment date. In this way, the rent of those apartments

equaled that of similar apartments that had been let more recently. He assumed that the actual rent for the apartments leased shortly before the assessment date was the economic rent. The expert based this conclusion on the fact that there was no rent control in Wall Township, all the leases were for a short term of one year, and he had found the stabilized actual rent of the complex to be comparable to the rent of other complexes within the general area. The expert then decreased the total annual rent by application of a vacancy factor of 2.5%, and increased it by $2,500 to account for income from the laundry concession. He arrived at a net operating income of $235,450.

The Tax Court concluded that "[t]he net operating income used by the plaintiff's witness is not 'an informed estimate of the probable prospective income from the property' based on an analysis of 'known rentals for similar space in the same or comparable locations.'" *Glen Wall Assocs., supra*, 6 *N.J.Tax* at 30 (quoting American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 325 (7th ed. 1978). The Tax Court specifically found that "there must be at least some basis in fact for the economic rent used in determining value and the facts must be made known to the court." *Id.* In *Bowen v. Bowen*, 96 *N.J.* 36, 50 (1984), we sought to emphasize that the market data that form the basis of the expert's decision must be in evidence. The so-called "judgment call" must be rooted in evidence that the court may evaluate. Upon analysis, we find that the adjusted rent roll does provide sufficiently reliable market data. We therefore disagree with the Tax Court and hold that the taxpayer's use of stabilized actual rent was a reasonable method of determining the economic rent of the complex and was supported by sufficient and competent evidence in the record.

In *Parkview Village Assocs.* we held

In the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project like this, functioning as customary with leases of relatively short length, should be deemed *prima*

*facie* to represent its fair rental value for purposes of the capitalized income method of property valuation. A court or taxing agency should be most hesitant to find that the tenants of a residential property being operated commercially are being charged inadequate rent. That approach, we believe, conduces to the objective of relative stability of assessments which we have heretofore held to be basic to sound tax assessment policy. [*Parkview Village Assocs., supra,* 62 *N.J.* at 34–35.]

*See also G & S Co. v. Eatontown,* 2 *N.J.Tax* 94, 98 (1980), aff'd, 6 *N.J.Tax* 218 (App.Div.1982) ("[i]n the absence of convincing contrary evidence, actual rents paid by the tenants of a well-managed apartment project are *prima facie* representative of economic rent.") (footnote omitted).

In rejecting the taxpayer's calculation of economic rent the Tax Court disregarded the presumption that actual rent equals economic rent in a well-managed apartment complex. Unlike the taxpayer's expert's "bizarre method of valuation" which was rejected by the court in *Rodwood Gardens, Inc. v. Summit,* 188 *N.J.Super.* 34 (App.Div.1982), Glen Wall's expert's valuation method is consistent with established valuation methodology. Based as it is on the actual rent in effect on January 1, 1980, and increased in recognition of the trend toward increasing rentals in the subject complex, the taxpayer's expert's calculation is entitled to a presumption within the standard established by *Parkview Village Assocs., supra.*

Furthermore, the presumption that a landlord is charging the market rent was not overcome by the Township in this case. Although the Township's expert challenged the rental figures used by the taxpayer, he did not offer any comparative support for his alternative rental figures. In addition, most of the income data on other properties presented by the Township's expert were admittedly estimated.

Moreover, although the Township's expert utilized a different method of arriving at economic rent, he determined an adjusted economic rent of $240,000. This figure differed from that of the petitioner's expert by only $4,550 per year, or 1.9%. This miniscule difference virtually confirms the accuracy of the taxpayer's economic rent figure. Such a minor difference

should have caused the court to hesitate before it held that the taxpayer had not produced sufficient competent evidence to determine the economic rent and, hence, the net operating income of the complex. An expert should be expected to support his opinion with as much documentation as necessary, but within realistic and practical limits. Courts should always be mindful of the time and money both taxpayers and municipalities must spend litigating these actions. Here, we find that in calculating net operating income, the expert produced sufficient competent evidence to support his figure of economic rent.

## IV

After determining the net operating income, an expert employing the building residual technique determines the capitalization rate to be used to capitalize the residual income attributable to the improvements. Here the taxpayer's expert used a 10% rate of return plus a 2.5% recapture rate and an effective rate of 2.47% to arrive at a capitalization rate of 14.97% for income attributed to the improvements and an overall capitalization rate of 11.95%, exclusive of the effective tax rate.

The taxpayer's expert testified that he arrived at his capitalization rate as follows: first, he considered mortgage rates and capitalization rates with respect to insurance company conventional mortgages made to apartment house purchasers in 1979. These figures were compiled by the American Council of Life Insurance and have received specific judicial approval as a basis for deriving a capitalization rate. *See Knollcroft Apartments Inc. v. Fair Lawn*, 3 *N.J.Tax* 25, 38 (1981). Second, he considered the return on other investments (e.g., U.S. Treasury bonds, corporate bonds, stocks), that would influence the return sought by a prospective investor in this type of property. The statistics were based on appraisal indicators printed in the December 1979 edition of *The Appraisal,* which is published by the American Institute of Real Estate Appraisers. The expert also took into account the relative advantages (e.g., tax advan-

tages), and disadvantages (e.g., lack of liquidity), of this type of real estate investment. Finally, the taxpayer's expert testified as to his extensive experience managing apartments and advising the purchasers of apartment complexes with respect to the rate of return that such purchasers were seeking during the years 1979–1980.

The Tax Court rejected the expert's capitalization rate, holding that there was neither sufficient evidence to support the expert's capitalization rate nor sufficient competent evidence from which the court could find a proper capitalization rate. *Glen Wall Assocs., supra*, 6 *N.J.Tax* at 31. The Tax Court stated "[t]he best evidence of such a capitalization rate is to be obtained from the real estate market, and the rates used by the witness were not related by him to the real estate market." *Id.* (footnote omitted). In essence, the Tax Court held that in determining the capitalization rate under the building residual technique an expert cannot rely on the rate of return of alternative investments or mortgage interest rates.

This holding is based upon a faulty premise—that in choosing a real estate investment investors consider only rates of return on real estate investments and not rates of return on alternative investments. To support its holding the Tax Court relies on *New Brunswick, supra*, 39 *N.J.* 537, in which we stated that "the inquiry relates to what investors in property of this kind *in fact* do demand and do obtain in deals with willing sellers." *Id.* at 551. In so relying, the Tax Court misinterprets language that actually supports the taxpayer's use of rates of return on alternative investments and mortgage interest rates. Today an investor in real estate considers alternative investments, for it is now "frequently said that realty values are established in money markets rather than in real estate markets." *The Appraisal of Real Estate* (8th ed. 1983), *supra*, at 72. "The economic volatility of the early 1980s emphasized the way in which money market and capital market activities and trends were related to the real estate industry." *Id.* at 88. "The value of all money influences the price of real estate.... To

help estimate a property's market value, an appraiser must thus acquire a knowledge of money and the value of a nation's currency." *Id.* at 102.

We recognize the difficulty of arriving at a capitalization rate. *See Bowen v. Bowen, supra,* 96 *N.J.* at 49; *Dugan v. Dugan,* 92 *N.J.* 423, 443 (1983). Ideally, an overall capitalization rate is derived, when sufficient data are available, from transactions of similar competitive properties. *The Appraisal of Real Estate* (8th ed. 1983), *supra,* at 388. However, it is usually difficult to ascertain the relevant data in order to analyze comparable sales. Here, although the Township's expert attempted to utilize the comparable sales approach to support his capitalization rate, he testified regarding data that he acknowledged he had estimated.

Although derivation of an overall capitalization rate from comparable sales is the preferred technique, it is not the only technique. That a capitalization rate can be calculated from an examination of alternative investments has been recognized by the Tax Courts. In *Middlesex Builders, supra,* 1 *N.J.Tax* at 315–16, after rejecting the capitalization rates offered by the expert as not constituting fair rates for return and recapture, the court decided on a rate of return "based on a consideration of the rates of return available on alternative investments during the applicable periods." Alternative investments analysis was again accepted as a means of calculating a capitalization rate in *525 Realty Holding Co., supra,* 3 *N.J.Tax* 206. "In establishing a capitalization rate I accept as fair and reasonable plaintiff's expert's use of a 9% return on investment, which is based on a study of alternative investments and mortgage interest rates during the period in question." *Id.* at 216.

Accordingly, we hold that the Tax Court improperly rejected the use of alternative investments as an available means of arriving at a capitalization rate. As we have emphasized, what is required is that reliable market data be furnished

to the court as the basis for the expert's opinion so that the court may evaluate the opinion. *Ante* at 275. We find here that sufficient evidence was admitted to provide the court with a basis for applying its own knowledge to determine a proper capitalization rate. The Tax Court is competent to make such determinations. As the Tax Court Enabling Act provides, "[t]he judges of the tax court ... shall be chosen for their special qualification, knowledge and experience in the matters of taxation." *N.J.S.A.* 2A:3A–13.

> The Tax Court has not only the right, but the duty to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question. [*New Cumberland Corp. v. Roselle*, 3 *N.J.Tax* 345, 353 (1981).]

*See also Samuel Hird & Sons, Inc. v. Garfield*, 87 *N.J.Super.* 65 (App.Div.1965) (Division of Tax Appeals erred in not using evidence before it to ascertain true value of property and to fix assessment); *Almax Builders, Inc., supra*, 1 *N.J.Tax* at 39 (court adopted its own capitalization rate despite fact that plaintiff offered no evidence as to rate of return); *Middlesex Builders, supra*, 1 *N.J.Tax* at 315 (court established capitalization rate based on proofs).

It is undisputed that an expert should fully document his opinion. An expert's duty to do so must never be compromised. However, an expert can always assemble more evidence than is necessary to support his opinion. In considering an expert's evidence a court should be cognizant of the expense incurred by litigants in engaging an expert. Therefore, the volume of information that is required to support an expert's opinion must be kept within practical and realistic limits. We do not suggest that a court should accept an expert's opinion that is unsubstantiated. Here, the taxpayer's expert submitted statistical data concerning alternative investments and mortgage interest rates, and testified about his own expertise as manager and consultant to numerous real estate owners of apartment complexes. We conclude therefore that if the Tax Court had viewed this expert's evidence practically and

within realistic limits, it would have found that the expert produced sufficient competent evidence to support his capitalization rate, or at least sufficient competent evidence from which the court could have determined a capitalization rate.

## V

 Both experts offered alternative valuation evidence based on the sale of the subject property less than three months after the assessment date of October 1, 1979. Although the deed of sale was introduced into evidence and testimony was heard on the terms of the sale as well as its cash equivalency, the Tax Court refused to consider evidence of the sale of the property. The Appellate Division directly addressed this issue by stating:

> We reject as without merit appellant's additional argument that Judge Rimm erred in failing "to consider the sale of the subject property only seven weeks after the critical assessing date as an alternative method of proving valuation," under the circumstance that appellant attempted to prove true value not by the sale price set out in the deed but by opinion testimony of a substantially lower cash equivalency of the sale price in the light of favorable financing terms.

We disagree and hold that the Tax Court should have considered the sale of the property as an indication of true value.

The deed of sale, dated December 20, 1979, indicated a sale price of $1,375,000. The price represented a $323,000 cash payment, the assumption of a six-percent mortgage of $352,000 and a purchase money second mortgage for $700,000 at six and one-half percent which escalates to ten percent by 1987. In addition, neither mortgage contained a personal guarantee and, as such, were nonrecourse loans. The taxpayer's expert testified that the cash value of the purchase was $1,010,500, indicating that the purchase price would have been lower had there not been advantageous financing available. Wall Township's expert testified that the cash value was the sale price of $1,375,000.

 In the valuation of real property for local taxation, "[t]he search, of course, is for the fair value of the property,

the price a willing buyer would pay a willing seller." *New Brunswick, supra,* 39 *N.J.* at 543. The focus is on the market value of the property, without regard to the particular circumstances of the owner. *Fort Lee v. Hudson Terrace Apartments, supra,* 175 *N.J.Super.* at 226. A current definition of market value is

> *[t]he most probable price in cash, terms equivalent to cash, or in other precisely revealed terms, for which the appraised property will sell in a competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.* [*The Appraisal of Real Estate* (8th ed. 1983), *supra,* at 33 (emphasis in original).]

This definition is sufficiently broad to encompass most transactions. *Id.*

In most instances, a seller wants to maximize price, while a buyer wants to minimize it. Therefore, it is well settled that a bona fide sale of property may be indicative of the true value of the property. Such a sale, however, is not dispositive on the issue of value. We recognize that there may be instances when the sale price may not reflect true value. In such instances it is for the court to appraise the circumstances surrounding a sale to determine if there were special factors which affected the sale price without affecting the true value. *L. Bamberger & Co. v. Division of Tax Appeals,* 1 *N.J.* 151 (1948); *Rek Investment Co. v. Newark,* 80 *N.J.Super.* 552 (App.Div.1963); *Almax Builders, Inc. v. Perth Amboy,* 1 *N.J.Tax* 31 (1980). Thus, a township is free to rebut evidence of a sale price with evidence that the sale was, for example, not made at arm's length, was a distress sale, or was a sham. No such evidence was presented here.

Moreover, because of the financing terms of a transaction the contract price may not be a true indicator of the market value of the property. For instance, here, the taxpayer's expert testified that the market value of the contract price of $1,375,-000 was $1,010,500, due to the favorable financing terms of the transaction. Financing arrangements may affect the market

value of property particularly with respect to valuation based on prices of comparable sales.

> The transaction price of one property may differ from that of an identical property because financing arrangements vary. If the purchasers of a comparable property had assumed an existing mortgage at a favorable (below current market) interest rate, they may have paid a higher price than purchasers of the subject property can be expected to pay under current market financing terms. The financing arrangements for each comparable property should be considered, and the necessary adjustments should be made to reflect the financing terms under which the subject property is expected to sell. [*The Appraisal of Real Estate* (8th ed. 1983) *supra*, at 315.]

The discrepancy between market value and price is reconcilable. Every financing arrangement has a cash value. An actuarial table will indicate the present value of a future stream of payments. Assumptions of existing mortgages below market rates can also be valued. *The Appraisal of Real Estate* (8th ed. 1983), *supra*, at 304–07. In this case testimony with respect to these issues was given by both experts.

Implicit in our holding that a sale of the subject property be considered as an indicator of market value is the requirement that the sale be not remote. The benefit of the comparison is lost if the effects of time have altered the factors which result in a determination of value. Our courts have considered the issue of remoteness. *See Rek Investment Co. v. Newark, supra*, 80 *N.J.Super.* at 560 (sale of subject property 2 months after assessment date "entitled to great weight"); *Samuel Hird & Sons, Inc., supra*, 87 *N.J.Super.* at 70–71 (sale 8½ months after assessing date considered); *Almax Builders, Inc. v. Perth Amboy, supra*, 1 *N.J.Tax* at 37 (sale 7 months after assessing date "admitted for its rational probative valuation inference"). Accordingly, we hold that the court should have considered the sale of the property, less than three months after the assessment date, as an indicator of value.

## VI

Viewed realistically and practically, the taxpayer's expert submitted sufficient evidence for the Tax Court to determine

the value of the property utilizing the building residual technique. The Tax Court's decision places an onerous burden on the taxpayer and ignores the time and expense such a burden imposes on a litigant. In this day of rising litigation expenses, it is important for the courts to adopt reasonable limits on what is to be expected of a litigant in presenting his case through the use of an expert. Thus, we hold that the taxpayer's expert's (1) use of the assessed value of the land, divided by the Chapter 123 ratio, to determine the market value of the land, (2) use of stabilized actual rent to determine economic rent, and (3) use of rates of return on alternative investments to determine the capitalization rate, were proper. In addition, the court should have considered the recent sale of the property as an indication of value.

Accordingly, we reverse the judgment of the Appellate Division and remand the case to the Tax Court to determine the value of the property in accordance with the principles expressed herein.

*For reversal and remandment* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, HERN and GARIBALDI—6.

*For affirmance* —None.