PER CURIAM.
Plaintiff appeals from a judgment of the Tax Court affirming the assessment of its property for the tax year 1989. We affirm.
Plaintiff is the owner of a garden-apartment complex comprised of 247 apartment units in 15 buildings constructed in approximately 1964 or 1965 and sited on 12.64 acres. The property was assessed for the tax year 1989 at $7,203,100, consisting of land at $1,111,500 and improvements at $6,091,-600. Through its expert, plaintiff contended the fair market value of its property as of October 1, 1988 was $10,900,000. Since the average ratio of assessment to true value in Parsippany for the tax year 1989 was 53.96%, plaintiff contends that the fair assessed value of the property should be $5,881,600.
The parties stipulated to a potential gross income of $1,932,-868. Although there was conflicting evidence as to the vacancy and collection loss factor, the trial judge found that 2% was appropriate, which he deducted from gross income. The judge also accepted plaintiff’s figure of $622,167 for expenses, arriving at net operating income of $1,272,691.
*278 The primary dispute between the parties had to do with the appropriate capitalization rate for converting the net operating income into capital value. Both experts utilized the mortgage/equity technique. Plaintiff’s expert used an interest rate for the mortgage portion of 10.50% with a corresponding constant of 11.33%, whereas the municipality’s expert used an interest rate of 10.25% with a constant of 10.75%. The major variance between the experts dealt with the equity portion with plaintiff’s expert, himself an investor as well as chairman of the lending committee for a savings and loan, concluding that an investor would demand a return on equity of 9.5%.
On the other hand, the municipality’s expert developed his capitalization rate relying, in part, upon data published by the American Council of Life Insurance’s (ACLI) “Investment Bulletin,” the American Institute of Real Estate Appraisers’ publication, “The Appraiser,” and data published by two real estate investment trusts. He arrived at an overall capitalization rate of 9%. The primary difference between the factors used by the experts in applying the mortgage/equity technique was that regarding the equity component. The municipality’s expert concluded that 5% was all that an investor would require by way of an equity return, as opposed to the 9.5% found by plaintiff’s expert.
The trial judge concluded that plaintiff’s expert did not consider appreciation of the property over the period of ownership, which he concluded an investor would consider. Quoting from the Appraisal of Real Estate, the trial judge stated:
Real estate investors are greatly influenced by the prospects for capital appreciation as a hedge against inflation. When an investor looks forward to property appreciation as a part of the eventual yield, he or she is obviously anticipating that the total yield rate will be higher than the expected rate of income—i.e., the overall capitalization rate. The total yield rate is a complete measure of profitability that includes any property appreciation. Therefore, the capitalization rate for an appreciating property equals the total yield rate minus an adjustment for expected growth. Similarly, the capitalization rate for a depreciating property can be seen as the yield rate plus an adjustment for expected loss. [American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed.) at 499]
*279 Although recognizing that the data provided by the ACLI may not be the best market evidence, the trial judge found it widely disseminated, readily available and frequently relied upon by professionals in the local property tax field. He observed that his colleague, Judge Crabtree, had taken judicial notice of it in an opinion. Ultimately, the trial judge accepted the capitalization rate advanced by defendant municipality’s expert. He applied a 9% overall rate which, with the effective tax rate of 1.57, resulted in capitalization at 10.57%, yielding a value of $12,040,600 which, when divided into the assessment of $7,203,-100 produced an assessment-value ratio of 59.82% which is within the chapter 123 common-level range. Thus, the judge affirmed the original assessment.
On this appeal, plaintiff contends that: (1) the Tax Court record contained insufficient evidence for the judge to rely on the ACLI tables, and (2) chapter 123 is unconstitutional as applied to the facts in this case. We find no merit to either of these contentions.
The Tax Court judge did not rely solely on the ACLI tables in reaching his conclusion. Rather, he found that the capitalization rate arrived at by the municipality’s expert, which relied, in part, on the ACLI tables, to be the more appropriate. He specifically observed that the capitalization rate of 9.5%, used by plaintiff’s expert for the equity component, did not take into consideration appreciation from the investment as part of the yield. He found plaintiff’s expert’s subjective selection of an equity rate, derived from a wide range of alternative investments, may not provide for capital appreciation. He concluded that the ACLI data simply narrows the range within which subjective appraisal judgment must operate. He found the rate selected by defendant municipality’s expert more persuasive because it was based on real estate investments, in particular, investments in apartment projects as opposed to the entire spectrum of alternative investments which may or may not be directly comparable to investment real estate.
 There exists a presumption in favor of a tax assessment made by the local taxing authority. This presumption can *280 be overcome only by the presentation by either party of sufficient competent evidence. Glen Wall Associates v. Wall Tp., 99 N.J. 265, 273, 491 A.2d 1247 (1985). In this case, the trial judge concluded that the parties had overcome the presumption of correctness of the original assessment. Therefore, he was required to make the necessary determination for the tax year 1989.
The judge recognized the principles enunciated in Glen Wall relative to reasonable limits to be placed on what is expected of a litigant in presenting his case through the use of experts. The figures compiled by ACLI have received specific judicial approval as a basis for deriving a capitalization rate. Id. at 277, 491 A.2d 1247. It is true that our Supreme Court has held it proper for an expert to rely not only upon rates of return on real estate investments, but also rates of return on alternative investments. Id. at 265, 491 A.2d 1247. Nevertheless, we conclude that the trial judge properly analyzed the testimony of the two experts and applied his own judgment to the valuation data submitted by them in order to arrive at a true value. A Tax Court judge is competent to make such determinations. Ibid.
We have carefully examined Judge Andrew’s opinion in Murnick v. Asbury Park, 2 N.J.Tax 168 (1981), rev’d in part, 187 N.J.Super. 455, 455 A.2d 504 (App.Div.1982), rev’d in part, aff’d in part and remanded 95 N.J. 452, 471 A.2d 1196 (1984), alleged by plaintiff to be inconsistent with his conclusions in this case because he accepted a capitalization rate which, in part, relied upon data from the ACLI. In his comments in Murnick, Judge Andrew observed,
The source information was obtained from 15 life insurance companies located and doing business throughout the entire United States. Such published data is subject to considerable differences in interpretation. The information published by national organizations is not always drawn from properties comparable to the subject. They may not account for locational difficulties extant in a particular community. The data may apply to properties that may not be typical of the property involved in a local property tax proceeding. [Id. at 187]
He found that such published statistical material may be helpful as a comparison check, but not persuasive without a show *281 ing that the subject fits the same category, which he found had not been made in Mumick. By contrast, in this case, although Judge Andrew specifically said that data provided by the ACLI may not be the best market evidence, he observed that the data relied upon by the expert in this case was localized, both geographically and to the type of construction. In reaching his conclusion, the trial judge noted,
I have been sitting on the Tax Court for close to 12 years now and I have yet to find objective market data that can unerringly lead you to one particular number that should be applied to convert income into a capital value, as was indicated by both attorneys during their summations. The range is somewhat subjective and depends a great deal upon whatever data is available and the expertise, competency, and the experience of the experts who testify in a particular matter.
In the final analysis, the judge applied his own expertise in the evaluation of the opinions of the two experts. Glen Wall Associates v. Wall Tp., supra, 99 N.J. at 280, 491 A.2d 1247.
N.J.S.A. 54:1-35a and N.J.S.A. 54:51A-6 (commonly known as chapter 123) were found to be constitutional in Murnick v. Asbury Park, supra. While the assessment in this case was found to be above the assessment-value ratio, it was within the chapter 123 upper limit of 62.05%, i.e., 15% above the average ratio of 53.96%. Plaintiff asserts that chapter 123 is unconstitutional as applied to it, contending this to be an egregious case. We consider it an exaggeration to say, “Because the property’s assessment ratio falls just shy of the Chapter 123 upper limit, the judge could not apply the average ratio to the true value.” We do not consider 59.82% “just shy” of the upper limit of 62.05%, which the Legislature has selected as the plus or minus factor of 15% to arrive at an average ratio.
Affirmed substantially for the reasons stated by Tax Court Judge Michael A. Andrew, Jr., in his oral opinion of March 12, 1991, as supplemented by his letter opinion of May 21, 1991.

Letter Opinion of May 21, 1991.

ANDREW, J.T.C.
I am in receipt of a copy of a notice of appeal relative to the above captioned matter. Pursuant to R. 2:5-l(b), I want to *282 amplify the remarks which I made on the record at the conclusion of the trial in order to insure that the necessary findings of fact and conclusions of law are sufficient for review by the Appellate Division.
As you will remember, both plaintiffs appraisal expert, Robert W. Hendricks and defendant’s appraisal expert, Arthur A. Linfante, III, employed solely income approach analyses in their appraisal reports to estimate, as of the assessment date of October 1, 1988 for the tax year of 1989, the fair market value, of the property known and designated as Block 767, Lot 16 on the tax map of Parsippany-Troy Hills Township. The property, a garden-apartment complex comprised of 247 apartment units in 15 buildings sited on 12.64 acres, was constructed in the 1964 to 1965 time period. It is located in an R5, residential zoning district and conforms to zoning requirements in all respects. Both experts were of the opinion that the highest and best use of the subject was a continuation of the existing multi-family apartment use.
As I have indicated, both experts derived their value estimates from an income approach analysis. The components of their income approaches were fairly similar except in two instances, their (1) vacancy and collection loss allowances and their (2) capitalization rate selections.
Essentially, I was called upon by the parties to resolve the dispute with regard to those two items, and therefore, my reason for this letter now is to enlarge on my comments solely with regard to those two elements.
I.

Vacancy and Collection Loss Allowance.

To begin with, Hendricks, plaintiff’s expert, was of the opinion that an appropriate vacancy and collection loss allowance for the subject property would be 2V2 of the property’s gross *283 annual rental potential, while defendant’s expert, Linfante, believed that 1% was more reflective of the vacancy and collection loss that should be attributable to the subject.
An allowance for vacancy and collection loss is required in an income approach to value because it is very likely that most properties will experience some vacancy or collection loss during the remaining economic or useful life of the improvements. Seldom are spaces occupied by new tenants on the same day a vacancy occurs, thus enabling full or continual occupancy. It is likely that competent management will be unable to collect all contract rents because of financial difficulties or other circumstances affecting tenants.
There are no standard vacancy allowances. The allowance is a market phenomenon and depends on many factors including: (1) the level of confidence an appraiser has in his estimate of fair market rent, (2) the ability of tenants to pay present market rents in the future, (3) an oversupply of competitive space in the area of the subject, (4) restrictions that may preclude new construction and (5) whether rent control is in effect.
Hendricks selected his figure of 2lh% based on: (1) his interviews of other garden apartment complex owners in Parsippany-Troy Hills Township, (2) his review of rent levels in facilities comparable to the subject, (3) the fact that the rental properties in the township were not affected by rent control, and (4) the level of competition for tenants in the township because of the number of garden apartment complexes.
He noted that the rent level at the subject was in the upper range of rentals being obtained in competing garden apartment projects in the township and, also, the absence of rent control. He recited the fact that his review of comparable properties revealed vacancy rates ranging from 2.52% to 5.53% and that vacancies at the subject were minimal. After his consideration of all of these factors, he concluded that 2lh% was a fair vacancy and collection loss allowance for the subject.
On the other hand, Defendant’s expert, Linfante, believed, based on his analysis, that an appropriate allowance would be *284 1%. Linfante based his analysis on information supplied to him by owners of a number of comparable garden apartment projects in the township. A summary of his analysis revealed a range of vacancy rates in the comparable units of 0% to 1.78%. I question, however, the method by which he determined that there were no vacancies or collection losses in some of the comparable facilities.
For example, to determine vacancies at Parklake Village, a comparable facility, he annualized the January 1989 rent roll by multiplying the rent roll by 12. He then ascertained the actual collections for the year of 1989 and noted that since actual rent collections exceeded the January 1989 annualized rent roll there was no vacancy or collection loss. That analysis does not establish the point. The actual collections could have been greater than the annualized January 1989 rent roll simply because rentals were increasing on a month-to-month basis over and above the January 1989 rentals and yet there could still be vacancies and collection losses.
Additionally, a good deal of his other data was after the pivotal assessment date in this case. Although I was impressed with the manner in which Linfante attempted to extract an appropriate vacancy rate, there may have been deficiencies as a result of an insufficiency of timely data.
On balance, however, I believed that I could not ignore the data and conclusion offered by Linfante and therefore, I concluded in light of (1) Hendricks’ estimate of 2V2%, (2) Linfante’s estimate of 1%, (3) Linfante’s summary showing a range with an upper limit of 1.78%, (4) the lack of rent control and (5) the fact that rentals being obtained at the subject were in the upper range of rentals in the township, that 2% was an appropriate vacancy and collection loss allowance.
II.

Capitalization Rate.

The second area of disagreement of the parties was with regard to the capitalization rate. Hendricks selected an overall *285 rate of 10.05% before his addition of an effective tax rate. Linfante was of the opinion that 9% was a better reflection of the market at the time of the pivotal assessment date of October 1, 1988.
Hendricks developed his overall capitalization rate of 10.05% using a mortgage-equity technique as follows:
Hendricks was of the opinion that 75% of the probable source of the capital to purchase the subject would come from a mortgage loan at a 10.5% interest rate for a 25-year period. The mortgage constant (the constant amount necessary to satisfy both the interest rate and amortization) for a mortgage loan at 10.5% interest for 25 years would be 11.33%. It was his opinion that such a mortgage loan could be obtained for the subject. Next, after reviewing a wide range of alternative investments producing returns from 3.61% to 9.51%, Hendricks believed that the putative investor would require at least a 9.5% return for his equity investment. He then deducted for equity buildup to account for the mortgage amortization and concluded a rate of 10.05%.
On the other hand, Linfante developed his capitalization rate after an extensive review of data published by the American Council of Life Insurance’s (ACLI), “Investment Bulletin,” the American Institute of Real Estate Appraisers publication, “The Appraiser,” and from data published by two real estate investment trusts. The ACLI “Investment Bulletin” provides data such as overall capitalization rates, interest rates, loan-to-value ratios, mortgage constants, debt-coverage ratios and other data relative to real estate investments. The ACLI data revealed overall capitalization rates ranging from 8.6% to 9.2% for apartments for the third quarter of 1988. “The Appraiser” reflected a capitalization rate range of 6.5% to 9.5% for real estate investments generally for the same period.
Based on these data, and his own appraisal judgment, Linfante selected an overall capitalization rate of 9%. As further support for his selected rate he developed an overall rate by the mortgage-equity, band-of-investment technique. The primary *286 difference between Linfante’s mortgage-equity technique and that of plaintiff’s expert was with regard to the equity component. It was Linfante’s opinion that 5% was all that an investor would require by way of an equity return, while Hendricks believed that 9.5% was the necessary requirement. Linfante derived his equity return estimate by extrapolation from the ACLI data, while Hendricks’ number was supported only by his subjective judgment and the wide range of alternative investments previously mentioned.
Hendricks’ method of deriving a capitalization rate, as he candidly noted in response to a question from the court, did not provide for any change in the value of the property over the period of ownership by the present owner. In other words, he did not anticipate any gain or loss in value of the subject property over the projected period of ownership.
Historically, investment properties, such as the subject, have been increasing in value. Whether that is due to inflation, the decreasing purchasing power of the dollar or pure value increments is of no significance. What is important is that such change in capital value must be considered. This is so because the investor considers it.
The Appraisal of Real Estate puts it this way:
Real estate investors are greatly influenced by the prospects for capital appreciation as a hedge against inflation. When an investor looks forward to property appreciation as a part of the eventual yield, he or she is obviously anticipating that the total yield rate will be higher than the expected rate of income—i.e., the overall capitalization rate. The total yield rate is a complete measure of profitability that includes any property appreciation. Therefore, the capitalization rate for an appreciating property equals the total yield rate minus an adjustment for expected growth. Similarly, the capitalization rate for a depreciating property can be seen as the yield rate plus an adjustment for expected loss. [American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed. 1987) at 499; emphasis supplied]
The ACLI data implicitly accounts for changes in capital value much the same as do capitalization rates derived from sales of competitive properties in the specific market area of the subject property. The data reveal the investor’s requirements for investments in real estate, and more particular in this case, for investments in apartment facilities.
*287 On the other hand, Hendricks’ rate selection process is based on his subjective selection of an equity rate that is derived from a wide range of alternative investments which may not provide for capital appreciation. The ACLI data simply narrows the range within which subjective appraisal judgment must operate. In this case the rate selection by Linfante was the more persuasive because it was based on real estate investments, in particular, investments in apartment projects as opposed to an entire spectrum of alternative investments which may or may not be directly comparable to an investment in real estate.
The capitalization data derived from the ACLI tables reflect the requirements of market participants in real estate, while the wide range of rates of alternative investments other than real estate, while competing with real estate for investment funds, do not provide a means to determine what rate an investor in real estate does demand before making an investment in real estate.
Although the data provided by the ACLI may not be the best market evidence, the remarks of Judge Crabtree of this court, relative to such data, should be repeated here:
I have undertaken an independent examination of the compendious data published by ACLI for all four quarters of each of the pretax years (1983 through 1986), with particular reference to the capitalization rates and loan values (mortgage positions) revealed by the ACLI data. To be sure, the capitalization rate column is not the product of sales; rather, the rates in the column reflect the relationship between net income and an appraiser’s estimate of fair market value of the property. Nevertheless, the capitalization rate data is highly probative inasmuch as the insurance companies included in the ACLI survey all make mortgage commitments on the basis of those appraised values.
/ find that the aforementioned data, while not in the record, are widely disseminated, readily available, and frequently relied upon by professionals in the local property tax field. I therefore take judicial notice of the data pursuant to Evid.R. 9(2).
Furthermore, this court may apply its own expertise in real property valuation; it is not obliged to accept the opinions of experts. Glen Wall Associates v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985). [Glenpointe Assocs. v. Teaneck Tp., 10 N.J.Tax 380, 395-396 (Tax Ct.1989); emphasis supplied]
There are three additional items that require brief mention. First, although plaintiff contended that the ACLI data was not *288 appropriate, neither plaintiff nor its appraisal expert claimed that the subject property would not meet the same standards and qualifications as those properties which produced the ACLI data. In other words, the ACLI data could well apply to an apartment complex such as the subject.
Second, plaintiff maintained that since the ACLI capitalization rates were derived by “dividing net stabilized earnings by the property value,” these rates were not a valid basis for the selection of a capitalization rate for the subject property. The argument is not persuasive. The use of net stabilized income or earnings does not ipso facto invalidate the ACLI data. Appraisers normally reconstruct actual operating statements in order to set forth the probable future net operating income of an investment. Moreover, plaintiff failed to explain why the use of “net stabilized earnings or income” would produce inappropriate or untoward results.
Third, plaintiff argued that the ACLI data involved a number of transactions with equity participations and joint venture loans, and therefore, the data were unusable. This argument is also unpersuasive. Plaintiff did not demonstrate whether any of the ACLI data relative to apartment complexes involved equity participations or joint venture loans. As a matter of fact, plaintiff did not point to any specific loan or category of loans within the ACLI data that were inappropriate because of equity participations or joint venture loans. To make the assertion does not establish the point.
For all of the foregoing reasons I accepted the capitalization rate advanced by Linfante, defendant’s expert.
In summary, and including the components which the parties stipulated and over which there was minimal dispute, I determined by means of an income approach that the value of the subject property for tax year 1989 was as follows:
*289 Gross Potential Rental Income $ 1,900,500
Less Vacancy and Collection Loss $ 2% —38,010
Effective Rental Income $ 1,862,490
Income from Laundry, Pool and Interest + 32,368
Effective Gross Income $ 1,894,858
Less Expenses — 622,167
Net Operating Income $ 1,272,691
$1,272,691 capitalized $ 10.57% (9% overall rate and 1.57 effective tax rate) (rounded) $12,040,600
Inasmuch as the value of $12,040,600, when divided into an assessment of $7,203,100 produced an assessment-value ratio of 59.82% which is within the c. 123 common-level range, there was no reason to change the original assessment. Thus, the Clerk of the Tax Court was directed to issue a judgment affirming the original assessment.