KAHN, J.T.C.
This local property tax matter involves the assessment for the years 1983 and 1984. The property consists of two buildings, one containing 172,693 square feet, the other 20,576 square feet, for a total of 193,269 square feet. The lot upon which said buildings are located consists of approximately 19.3 acres. The property is located on Route 46 and River View Drive, and is known as Block 170, Lots 1, 2, 3 and 4. On the relevant assessment dates (October 1,1982 and October 1,1983) the property was utilized as a shopping center.
The assessments appealed from are as follows:
1983 1984
Land $1,783,700 Land $3,150,000
Improvements 3,216,300 Improvements 6,320,000
Total $5,000,000 Total $9,470,000
The parties, through their experts, used both the income capitalization and the market data approaches. Both experts indicated that they relied more heavily on the income capitalization approach to arrive at their opinion of true value, but stated that their opinions were supported by their market data analyses. The parties utilized differing techniques in their income capitalization analyses. Both experts rendered an opinion as to economic rent for the premises. Taxpayer’s expert considered the improvements as rentable parcels of varying sizes and ascribed a separate economic rent for each size parcel. His analysis took into consideration the actual rentals received by the taxpayer as well as rentals from comparable leases in similar shopping centers. For the two years in question, taxpayer’s expert arrived at the following economic rent data:
*218 October 1, 1982
Small Office Space: $20.00 a sq. ft.
Retail Sales Space:
1.000 to 5,000 sq. ft. $15.00 a sq. ft.
5.001 to 10,000 sq. ft. $13.00 a sq. ft.
10.001 to 25,000 sq. ft. $ 9.00 a sq. ft.
25.001 to 50,000 sq. ft. $ 3.75 a sq. ft.
50.001 and up $ 3.50 a sq. ft.
October 1, 1983
Small Office Space: $20.00 a sq. ft.
Retail Sales Space:
1.000 to 5,000 sq. ft. $15.75 a sq. ft.
5.001 to 10,000 sq. ft. $13.65 a sq. ft.
10.001 to 25,000 sq. ft. $ 9.45 a sq. ft.
25.001 to 50,000 sq. ft. $ 3.75 a sq. ft.
50.001 and up $ 3.68 a sq. ft.
Converting this analysis to the subject property, the taxpayer’s expert rendered the following opinion as to the economic rent chargeable to said property at 100% occupancy.
Operating Statement — October 1, 1982
Income
Small Office Space: 1,440 sq. ft. at $20.00 a sq. ft. $ 28,800
Retail Sales Space: 4,191 sq. ft. at $15.00 a sq. ft. $ 62,865
7,151 sq. ft. at $13.00 a sq. ft. $ 92,963
41.111 sq. ft. at $ 9.00 a sq. ft. $ 369,999
46.111 sq. ft. at $ 3.50[1] a sq. ft. $ 163,307
93,265 sq. ft. at $ 3.50 a sq. ft. $ 326,428
Gross Potential Income (100% occupancy) $1,044,362
*219 Operating Statement — October 1, 1983
Income
Small Office Space: 1,440 sq. ft. at $21.00 a sq. ft. $ 30,240
Retail Sales Space: 4,191 sq. ft. at $15.75 a sq. ft. $ 66,008
7,151 sq. ft. at $13.65 a sq. ft. $ 97,611
41.111 sq. ft. at $ 9.45 a sq. ft. $ 388,499
46.111 sq. ft. at $ 3.50[2] a sq. ft. $ 163,307
93,265 sq. ft. at $ 3.68 a sq. ft. $ 343,215
Gross Potential Income (100% occupancy) $1,088,880
The parties differed on the actual vacancy for the two years in question. Taxpayer’s appraisal expert shows a slightly different measurement for the 46,111 square foot parcel, but the parties stipulated to 46,111 square feet.
Taxpayer’s appraisal expert estimated a vacancy rate of 25% for tax year 1983 based upon the alleged 36% actual vacancy and on the fact that the improvements were recently converted from a single tenant to a multi-tenant facility, which conversion required extensive renovation and start-up time. For the tax year 1984, the witness assumed a 15% vacancy rate based upon the same analysis, while the actual vacancy rate was 24%[3].
With respect to expenses, taxpayer’s witness deducted 5% of effective gross income for management, 3% as a reserve for structural repairs and 1% for miscellaneous expenses (legal and accounting). He indicated that management included collection of rents, servicing of tenants, arranging repairs and a factor for the amortization of brokerage commissions. He indicated that 5% was a conservative estimate for these items. The witness calculated 3% for reserves based upon his estimate of amortized cost to replace the roof, parking pavement and the heat, ventilation and air conditioning equipment. He indicated a 15-year life for each of the above and utilized cost manuals to arrive at his conclusion. Taxpayer’s witness utilized the same expense factors with respect to expenses for the 1984 tax year.
*220 The expert testified that he used comparable vacant land sales, adjusted their size, location and date of sale to the subject and arrived at values for the subject land of $125,000 an acre for 1983 and $135,000 an acre for 1984. He stated that he utilized the building residual technique because he felt that he could derive an accurate land value from the comparable sales, particularly the comparable sale of the West Belt Plaza. He said that the West Belt Plaza was the subject of a purchase of improvements for $1,190,000, the land being subject to a long term lease, with the purchaser having an option through 1982 to purchase the land for $825,000. Although the witness acknowledged that the land rent, beginning at $99,000 annually, would increase over the term of the lease, he suggested that this sale was evidence both of land value and the fact that investors do consider separate valuation of land and improvements. No effective tax rate was utilized, since the witness presumed that leases for the subject improvements would require the taxes to be the obligation of the tenant.
In arriving at his base capitalization rate of 12.5%, this expert indicated that mortgages were available at interest rates of 14.25% on or about October 1, 1982 and at 12.5% on or about October 1, 1983. He felt that it would be appropriate, on a conservative basis, to use 12.5% for both years. He indicated reliance upon appraisal indicators such as the American Council of Life Insurance tables, some of which were included in his report. He stated that alternative investment options were considered in the formulation of his base capitalization rate. He suggested that on or about the relevant assessment dates corporate bonds provided a return to an investor of more than 12.5%. He stated that an investor in the subject property would require a return on investment less than corporate bonds because the subject property, although perhaps more risky, could provide significant tax advantages as well as capital appreciation. Considering these factors, the witness arrived at *221 12.5% as a capitalization rate for both 1983 and 1984.[4]
The following constitutes the taxpayer’s calculations and findings of true value for the years 1983 and 1984, utilizing the building residual technique:
[[Image here]]
*222 [[Image here]]
The witness further considered an overall capitalization approach utilizing a mortgage equity type technique. As previously noted, he analyzed potential mortgage availability as well as required rates of return. Based upon the same information utilized in his building residual analysis, he projected a 75%/25% division between mortgage and equity. He indicated that the investor would require a 10% return on his 25% investment and would be able to obtain a 20-year, 15% mortgage as of October 1, 1982 (15.8% annual constant). As of October 1, 1983, with the same division between mortgage and equity, the witness suggested the same 10% return on equity, but with a 25-year, 14% mortgage (14.92% annual constant). The expert relied upon the aforementioned comparable sales as well as appraisal publications, including the American Council *223 of Life Insurance tables. He arrived at the following overall capitalization rates:
1983
Equity return: 10% X 25% = 2.50%
Mortgage constant: 15.8% X 75% = 11.85%
Overall Capitalization Rate 14.35%
1984
Equity return: 10% X 25% = 2.50%
Mortgage constant: 14.92% x 75% = 11.19%
Overall Capitalization Rate 13.69%
Based on his experience, the witness then adjusted these rates to 13.8% for 1983 and 13.9% for 1984, and applying each rate to the appropriate net operating income, concluded as follows:
1983
Net operating income $711,468 -f- 13.8% = $5,155,565
1984
Net operating income $840,765 -h 13.9% = $6,048,669
The witness indicated that he preferred the building residual technique in this case.
Taxpayer’s appraisal expert’s market data analysis consisted of a review of sales of several improved properties. The witness made adjustments for size, location and time, as well as the condition of improvements, and arrived at an adjusted square foot cost for the subject property. He indicated that he was not totally familiar with the financing details of all of the comparables, or the income and expense statements of same, except the comparable previously referred to as the West Belt Plaza. He acknowledged that the market data approach was not his primary approach, but stated that it served to corroborate his findings under the income capitalization approach. *224 Under the market data approach the witness concluded that true value as of October 1, 1983 was $4,845,400 (rounded), and as of October 1, 1984, was $5,330,000 (rounded).
The municipality's appraisal expert began his income capitalization analysis by arriving at his opinion of economic rent. He indicated that the subject leases in effect as of the October 1, 1982 and October 1, 1983 assessment dates, and the rents received thereon, constituted the economic rent. His opinion was based upon his review of the subject leases and his experience. This experience, according to the witness, rendered it unnecessary for him to examine the market for comparable rents.
With respect to the vacant 46,111 square feet of space, he attributed $7 a square foot as economic rent as of October 1, 1982 and $8 a square foot as of October 1, 1983. His opinion was based upon his belief that the 46,111 square feet of space would more appropriately be subdivided into smaller parcels which command higher square foot rentals. He utilized three leases on the subject property which ranged from $8.50 to $9.50 a square foot. He did not investigate the market. He made adjustments for size, time and location within the improvements, as well as the condition of the subject parcel to arrive at the aforementioned conclusion. By stipulation, his economic rent for the leased portion of the premises for 1983 was $880,000[5], which when added to $322,777 (vacant 46,111 square feet at $7 a square foot), results in a total gross rental of $1,202,777 for the 1983 tax year. For the 1984 tax year he utilized the $887,045 actual rental. He added $368,808, representing the vacant 46,111 square feet of space at $8 a square foot, resulting in a total gross economic rent of $1,255,853.
*225 With respect to the vacancy rate, the taxing district’s expert allowed a 10% deduction for 1983 and 5% for 1984. He allowed the 10% in 1983 recognizing the recent conversion of the improvements to a multi-tenanted facility and the assumption that time was needed to obtain tenants. The witness stated that for 1984 a 5% vacancy should be allowed. He based this conclusion on his “experience” and on the fact that on several occasions while driving in the vicinity of Routes 46 and 23 in Wayne, he had not noticed any significant vacancy in other similar shopping centers.
He allowed a total of 5% for each tax year as a deduction for both structural repairs and management expenses. He did not include any deduction for brokerage commissions, accounting or legal costs, because he felt that existing leases were long term in nature, thereby requiring little or no expense. He indicated that he did not review income and expense statements for either the subject properties or any comparables to arrive at his opinion. He acknowledged that the taxpayer would have to consider at some time in the future replacing the roof, the parking area and the mechanical equipment operating the heating, air conditioning and ventilation as structural repairs. He did not review taxpayer’s expense reports but rendered an opinion that his amortized cost would be 2'/2% of the 5% total. This would leave 2 ¥2% remaining to cover management expense.
The taxing district’s expert also posited a 75%/25% breakdown of mortgage to equity participation. He indicated that a 13% mortgage for a term of 25 years would be available for both years in question. As did the taxpayer’s expert, he indicated that an investor would require a 10% equity return. The witness arrived at this opinion based mainly upon his “experience” as well as telephone conversations with bankers with whom he was acquainted. He examined no comparable sales or mortgage commitments entered into proximate to the relevant assessment dates. He indicated that he was familiar with certain of the American Council of Life Insurance tables, none of which were supplied by the witness or annexed to his *226 report. He finally indicated that mortgages would have been available at rates of 12.5% to 14.5% during the relevant periods and that 13% would be a fair standardization.
The application of his 12.65% capitalization rate to his calculation of net operating income produced rounded values of $8,130,000 for 1983 and $8,960,000 for 1984.
The witness also utilized a market approach, which he claimed corroborated his findings under the preferred income capitalization approach. He stated that he considered certain comparable sales, made general adjustments, without specific calculations, and arrived at a value. He further testified candidly that he had not reviewed most of the documentation of said sales on income and expense reports concerning said com-parables.
ECONOMIC RENT.
The major dispute between the experts involves the designation of economic rent for the vacant 46,111 square feet of space. The parties stipulated that economic rent for the leased space for 1983 was $880,000. No such stipulation was made for 1984. The taxing district’s expert relied totally on leases for the subject property, whereas taxpayer’s witness analyzed the subject’s leases and leases for like space in other similar shopping centers. The beginning point of all studies under the income capitalization method is the determination of economic rent. Economic rent is defined as: “The rental income that a property would most probably command in the open market as indicated by. contract rent being paid and asked for comparable space as of the date of the appraisal.” American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) at 352. The municipality presented no evidence of comparable rentals and relied only on the actual rents received by the taxpayer.
Case law confirms that economic rent requires a comparison of rents payable at comparable properties in the competitive area for the period in question. Rodwood Gardens, Inc. v. *227 Summit, 188 N.J.Super. 34, 455 A.2d 1136 (App.Div.1982); New Brunswick v. Tax Appeals Div., 39 N.J. 537, 189 A. 2d 702 (1963).
Clearly, taxpayer’s appraisal expert’s analysis of leases for the subject property, in conjunction with leases of comparable space, is in accord with reliable and well established principles. The witness reviewed his findings and made adjustments. Consequently I find the economic rent to be $880,000 for 1983 (as stipulated). For 1984, with respect to the leased portion of the premises, I find the economic rent to be $923,655.
The weight to be given any expert testimony depends upon the facts and reasoning which are the foundation of his opinion. Schmertz v. Dover Tp., 4 N.J. Tax 145, 151 (Tax Ct.1982); Passaic v. Gera Mills, 55 N.J.Super. 73, 90, 150 A.2d 67 (App.Div.1959). An expert’s opinion may be adopted in whole or in part or be completely rejected. Middlesex County v. Clearwater Village Inc., 163 N.J.Super. 166, 174, 394 A.2d 390 (App.Div.1978), certif. den. 79 N.J. 483, 401 A.2d 239 (1979).
I disagree with taxpayer’s expert's analysis of the economic rent for the vacant 46,111 square feet of space. He suggests that its highest rental potential is as one large unit, at $3.50 a square foot. He bases his opinion on the deterioration of that particular space and the fact that the subdivision of said space would require major construction for access to the parking lot. Taxpayer’s appraisal expert relied upon a photograph of a rental sign as evidence of taxpayer’s attempt to rent the vacant parcel. Although division of the parcel would require construction, some of which might be the responsibility of the landlord, I find that taxpayer’s return would be greater than $3.50 a square foot.
I reject the taxing district’s appraisal expert’s opinion that economic rent for the vacant parcel should be $7 a square foot for 1983 and $8 a square foot for 1984. This expert did not inspect the premises, had no first hand knowledge of its condition and failed to analyze the market outside the subject proper *228 ty. Since there is ample testimony in this case demonstrating that shopping centers consist of leased space of varying degrees of size, I conclude that a subdivision into smaller parcels is feasible.
The vacant 46,111 square feet of space could support potential rentals in the 10,001 to 25,000 square foot range which, according to taxpayer’s witness, would return $9 a square foot in 1983 and $9.45 a square foot in 1984. The remaining approximately 25,000 square feet of space could return $3.50 a square foot in 1983 and $3.75 a square foot in 1984. Construction costs, as testified to by taxpayer’s appraisal expert, should be taken into consideration, since not all renovation and rehabilitation would be the responsibility of the tenant. The taxing district’s expert admitted that he had not inspected this space but acknowledged that some construction costs would be the responsibility of the taxpayer and would affect the rental received.
Taking into consideration these factors, I conclude economic rent for the vacant 46,111 square feet of space is $6 a square foot for 1983 and $6.50 a square foot for 1984. The total economic rent for the property is computed as follows:
1983
46,111 sq. ft. x $6 a sq. ft. $ 276,666.00
Stipulated leased space 880,000.00
Total Economic Rent $1,156,666.00
1984
46,111 sq. ft. x $6.50 a sq. ft. $ 299,721.50
Leased space 923,655.00
Total Economic Rent $1,223,376.50
VACANCY AND RENT LOSS.
Taxpayer’s expert urges a 25% vacancy allowance for 1983 and 15% for 1984, relying mainly upon his opinion that there was a 36% vacancy rate in 1983 and a 24% vacancy rate in *229 1984. He also relies on the undisputed fact that about October 1, 1983 the property was converted from a single tenant user to a multi-tenanted facility. The taxing district’s appraisal report acknowledges this fact, but argues that a 10% rate is proper for 1983 while a normal vacancy rate of 5% is applicable for 1984. I have already determined that taxpayer failed to establish that it made a significant effort to rent the vacant area during the relevant tax years. I also must take into consideration the fact that both experts indicated little or no vacancy in other commercial shopping areas in the Route 23/Route 46 area, which is described as the competitive shopping area to the subject.
Accordingly, I find the appropriate vacancy and collection loss rate for 1983 to be 10% of gross income. For 1984, I find the taxpayer had sufficient time to achieve full rental and did not justify the existing vacant area of 46,111 square feet which appears to be prime space.
1983
Gross Income $1,156,666
Less 10% Vacancy 115,666
Effective Gross Income $1,041,000
1984
Gross Income $1,223,376
Less 5% Vacancy 61,169
Effective Gross Income $1,162,207
EXPENSES.
Taxpayer’s appraisal expert recommends an allowance of 5% for management, 3% for reserves and 1% for miscellaneous expenses (legal and accounting). The municipality’s expert suggest a total of 5%, consisting of 2V2% for management and 2V2% for reserves. The taxing district’s appraisal expert urged that no allowance should be made for brokerage commissions or leasing and legal expenses.
*230 Both experts acknowledge the need to allow for reserves to replace the roof, heating, ventilating and air conditioning equipment, as well as the parking pavement. Both posit a 15-year life for these items. The difference in their opinions lies in the cost information.
I find taxpayer’s expert to be more reliable. The taxing district’s expert’s failure to include brokerage commissions solely on the basis that the leases on the subject property were current for the assessment years in question, demonstrates a lack of understanding of the process. He also failed to acknowledge the necessity for ongoing legal and accounting expenses.
I find that a shopping center consisting of approximately 193,000 square feet of space, with numerous tenants and varying sizes and uses, creates the need for ongoing repairs and construction. The fact that leases may have been executed in a particular year (not the assessment year) and will not expire for several years, does not eliminate legal expenses. Furthermore, 1 find that the owner of the subject property would have a continuing need for tax advice and services. While these expenses may not all come up in every year, it is not unreasonable to consider and amortize them.
Management is a proper expense for income producing rental property regardless of whether an actual fee for management is paid. The Appraisal of Real Estate, supra at 350.
Under normal conditions, the allowance for management reflects the expenditure of time for accounting, rent collection, advertising and on-site supervision. Murnick v. Asbury Park, 2 N.J. Tax 168 (1981), rev’d on other grounds 187 N.J.Super. 455, 455 A.2d 504 (App.Div.1982), rev’d in part and aff’d in part 95 N.J. 452, 471 A.2d 1196 (1984).
The taxing district’s appraisal expert did not review the records of the subject property or of comparable properties. With respect to reserves, I also find taxpayer’s expert more *231 reliable. He was more precise with respect to his use of the cost manual and was clearly more familiar with the subject property. Additionally, he considered expenses of comparable properties.
I, therefore, find an appropriate allowance to be 5% for management, 3% for reserves and 1% for miscellaneous (legal/accounting). This finding is for both years in question. As a result, net operating income is calculated as follows:
[[Image here]]
CAPITALIZATION.
Taxpayer’s appraisal expert analyzed the income and expense data utilizing both the building residual capitalization technique and the mortgage equity overall rate capitalization technique. He indicated preference for the building residual technique primarily based upon the existence of a comparable sale reasonably current in time to the relevant assessment dates and in the same general vicinity as the subject.
The taxing district’s appraisal expert recommended the mortgage equity overall rate method stating that the marketplace does not view the purchase of income-producing shopping cen *232 ters by a separate valuation of land and improvements. Although the West Belt Plaza comparable demonstrates a sale of improvements apart from land, I find that this was an isolated sale not reflective of the general marketplace. In fact, both parties submitted several comparable sales in their market data approach methodology, all of which (excepting the West Belt Plaza sale) involved sales of land and improvements with combined prices. No explanation was offered by taxpayer’s expert as to whether the $825,000 option price for land was the value of the land as of the relevant assessment date. The $825,000 option price was an agreed price between the parties considering (a) the land rental beginning at $99,000 a year, and (b) the time period for the option (through 1992). No testimony was offered to indicate whether or not the option was exercised and the land purchased.
The Supreme Court in Glen Wall Assoc. v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985), recognized that the overall rate analysis, although perhaps preferred, is not the only valuation technique. Specifically, the Court acknowledged that the building residual technique is an acceptable method of appraising income-producing property.
The Supreme Court in Glen Wall, also noted that at trial the taxpayer utilized the land assessment as the land value from which to begin its analysis. This amounted to a stipulation by the taxpayer to the taxing district’s contention as to land value. The taxpayer in Glen Wall did not need to use comparable sales and make adjustments as does the taxpayer in the case at bar.
I find that the more reliable evidence supports the use in this case of the overall rate method. Glen Wall does not require use of the building residual technique. That Court reaffirmed the Tax Court judge’s authority to utilize his experience along with the evidence submitted by the parties. “This Court has not only the right, but the duty to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in *233 question.” New Cumberland Corp. v. Roselle, 3 N.J. Tax 345, 353 (Tax Ct.1981). The Supreme Court in Glen Wall cited Almax Builders, Inc. v. Perth Amboy, 1 N.J. Tax 31 (Tax Ct.1980), wherein the Tax Court adopted its own capitalization rate despite the fact that taxpayer offered no evidence of a rate of return. See also Middlesex Builders v. Old Bridge Tp., 1 N.J. Tax 305 (Tax Ct.1980).
Both experts also utilized an overall rate capitalization method. Employing the mortgage equity technique, the appraisal experts differ on the mortgage interest rates available on the assessment dates.
The various appraisal indicators annexed to taxpayer’s appraisal (none were annexed to the taxing district’s appraisal) demonstrate available mortgage rates as well as capitalization rates from a point of time in 1982 through 1984. During the time period surrounding the fourth quarter of 1982, the mortgage rates appeared to be higher. Rates decreased through 1983, and in the fourth quarter of 1983 mortgage rates approximated 12.75%. It appears that taxpayer relied most heavily on his one comparable sale which showed a 15% mortgage rate.
Our courts, most recently in Glen Wall, supra, have determined that such documentary evidence may be sufficient. Although the Court recognized that the ingredients of a capitalization rate may best be obtained from comparable sales in the marketplace, appraisal indicators such as the American Council of Life Insurance have “received sufficient judicial approval.” As Judge Evers stated in Berkley Arms Apartment Corp. v. Hackensack, 6 N.J. Tax 260 (Tax Ct.1983):
As is the case with forecasting weather, forecasting interest rates is very unpredictable. Thus, in view of the need for stability in taxation, our cases uniformly hold that true value of realty must be ‘fairly constant and must be gauged by conditions, not temporary and extraordinary, but by those which over a period of time will be regarded as measurably stable.’ [at 2601
To formulate a capitalization rate for the two years in question, the starting point is the required return on invested capital, which in the opinion of both experts is 10%. This produces a capitalization factor of 2.5% (10% x 25% = 2.5%). I *234 find that a 13.5% mortgage rate should be utilized for both the 1983 and 1984 tax years. In keeping with the direction in Berkley Arms, I feel it necessary to standardize the mortgage rate. The mortgage rate of 13.5% takes into consideration the higher available rates in the fourth quarter of 1982 and reflects the decline in rates through the year 1983 and into 1984. I find this methodology in keeping with the accepted view to eliminate peaks and valleys and arrive at consistent assessments. This 13.5% mortgage rate would be available for a term of 25 years bearing an annual constant of 13.98%. I, therefore, find the overall capitalization rate for both 1983 and 1984 to be calculated as follows:
Equity Return: 10% x 25% = 2.50%
Mortgage Constant: 13.98% X 75% = 10.49%
Overall Capitalization Rate: 12.99% (rounded to 13%)
Applying this capitalization rate to my findings of net operating income for 1983 and 1984 produces the following valuations:
1983
Net Operating Income of $947,310 13% = $7,287,000 Total Value
1984
Net Operating Income of $1,057,609 -f- 13% = $8,135,454 Total Value
MARKET SALES APPROACH.
Both appraisal experts utilized a market data approach. The taxing district’s appraisal expert selected a group of sales and came to a conclusion as to the value of the subject property allegedly adjusting for time, location and condition and converting to a cost per square foot of building area. He concluded $45 a square foot building area, including land as of October 1, 1982, and $50 a square foot of building area, including land, as of October 1, 1983. The taxpayer’s expert performed the same type of analysis, making adjustments for the same factors but arriving at $24 a square foot of building area, including land, *235 for October 1, 1982 and $27.50 a square foot of building area, including land, for October 1, 1983.
I find that neither expert relied heavily on this approach, and the experts failed to adequately support their adjustments. The parties themselves relied more heavily upon the income capitalization approach and I find that the income approach clearly is reflective of the marketplace. The subject property is a multi-tenanted income producing property. I am satisfied that a prospective investor would view a purchase exclusively through consideration of the income stream. Neither expert produced persuasive evidence from which I could conclude that the sales upon which the parties relied were comparable. I, therefore, cannot utilize either party’s evidence as to comparable sales as either a primary or corroborative determination of value.
VALUATION AND DISCRIMINATION.
I, therefore, conclude that the true value for the subject property is as determined by the income capitalization approach, specifically $7,287,000 for 1983, and $8,135,450 for 1984.
In 1983 the average ratio was 68%, the upper limit being 79%, and the lower limit being 57%. The assessment for 1983 ($5,000,000) is 68.61% of my finding of true value ($7,287,000). The assessment to true value ratio for 1983 lies well within the upper and lower limits of the common level range as promulgated by the Director of the Division of Taxation. I, therefore, affirm the assessment for the subject property for 1983 as follows:
Land $1,783,700
Improvements 3,216,300
Total $5,000,000
Since 1984 is a revaluation year, the common level range as promulgated by the Director of the Division of Taxation is inapplicable. My finding of true value of $8,135,450 is the proper assessment for the 1984 year. I find that the proportion *236 between land and improvements should be the same as the proportion in the assessment. Land equals 33% of the total assessment.
I, therefore, conclude that the proper assessment is $2,684,-700 for land and $5,450,750 for improvements.
The Clerk of the Tax Court is directed to enter judgment affirming the assessment for 1983 as follows:
Land $1,783,700
Improvements 3,216,300
Total $5,000,000
The Clerk of the Tax Court is directed to enter judgment for 1984 as follows:
Land $2,684,700
Improvements 5,450,750
Total $8,135,450

 Taxpayer’s appraisal expert described this space as being in poor condition with water damage and broken tiles with only one access to the street. This area was vacant as of October 1, 1982.

 This area was vacant as of October 1, 1983 and in the same condition as the prior year.

 Taxpayer’s expert testified that as of October 1, 1983 the 46,111 square foot parcel was vacant. The expert stated that for the previous year there was additional vacant space.

 To capitalize the value of the building the expert added a 2.5% recapture factor to his base capitalization rate. He indicated, based upon his experience, that the improvements had a remaining economic life of 40 years. The proposed capitalization rate for improvements for tax years 1983 and 1984 is 15%.

 Taxpayer’s appraisal expert indicated total gross income for the 1983 tax year to be $1,198,444. The parties stipulated that for the 1983 tax year economic rent was $880,000 with the exception of 46,111 square feet. There is a difference of opinion between the appraisal experts concerning the economic rent for the vacant 46,111 square feet of space.