RIMM, J.T.C.
This local property tax assessment matter involves valuation and discrimination for the tax year 1983. The subject property, known as Pennant Club Apartments, is located at the intersection of Brewers Bridge Road and New Prospect Road and consists of two contiguous tax lots known as Block 122, Lots 1A and 10A on the tax map of defendant township. One lot is a 17.7-acre tract; the other lot contains 6.40 acres; and the site has a gently rolling terrain. Utilities available to the site are public water, electric, sewer and telephone.
The property is improved with 31 two-story buildings, with partial basements, containing a total of 372 garden apartments. The apartments consist of 124 two-bedroom apartments and 248 one-bedroom apartments with various floor plans. The improvements were constructed in about 1971 and are considered to be in good condition. There is on-site parking for approximately 559 cars. There are sidewalks throughout the complex, and the property is fully landscaped. There is also a pool and a recreation building with a two-car garage. Near the swimming pool is a youth area with various types of playground equipment.
The property was originally assessed for the tax year 1983 as follows:
Land $ 744,000
Improvements 5,106,000
Total $5,850,000.
The matter is before the Tax Court on appeal from a judgment of the Ocean County Board of Taxation affirming the assessment.
At the trial, the parties stipulated as follows:
*370 1. The income approach to value is the appropriate method for valuing the subject property, and neither party is to present any evidence of value based on the cost or market data approaches to value.
2. The net operating income to be capitalized is $975,000.
3. The land value is $1,300,000.
4. The sale of the subject property is to be used as a “check” on the value determined by the income approach, but the parties do not agree on the cash equivalency of the sale price of the subject property.
I.
One witness called by plaintiff is the present assessor. He testified concerning SR1A forms relating to the subject property. One form indicated a sale from Pennant Club Inc., a New Jersey corporation, to FTL Realty Corp., a New Jersey corporation, for $7,450,000. The deed, dated August 31, 1979, was recorded in Ocean County deed book 3853, page 488 on September 4,1979. The second form indicated a sale from FTL Realty Corp. to Pennant Associates, a limited partnership of New York, plaintiff in the present matter, for $745,000. The deed, dated August 31, 1979, was recorded on September 4, 1979 in Ocean County deed book 3853, page 505. The total price paid on August 31, 1979 as indicated by the two deeds was $8,195,-000.
Plaintiff also called an appraiser as one of its witnesses. It was his opinion that, based on the income approach to value and the stipulations entered into between the parties as to net operating income and land value, the property had a value of $6,471,000 as of October 1, 1982, the critical assessing date for the tax year 1983. The value was arrived at by the use of the building residual technique of the income approach to value requiring the determination of a land capitalization rate and a building capitalization rate. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) 395-396; Glen Wall Associates v. Wall Tp., 99 N.J. 265, 271, 491 A.2d *371 1247 (1985) (“The building residual technique is an acceptable method of appraising income-producing property.”).
The witness’ land capitalization rate consisted of two components: a “safe rate” of 10% and an effective tax rate of 3.0702% for a total land capitalization rate of 13.0702%. The effective tax rate was computed by taking the actual tax rate of $4,386 per $100 of assessed valuation and multiplying it by the chapter 123[1] ratio of 70%.[2] The 10% component of the land capitalization rate is the “appropriate safe rate for interest” according to the witness. When asked what the factual basis was for his “safe rate,” the witness said, “I saw, see, and hear the marketplace, feel that 10% is the appropriate number,----” The witness also said that he consulted appraisal indicators in coming to his conclusion that 10% was the correct rate to use in determining a land capitalization rate. The appraisal indicators were addenda to the witness’ appraisal marked in evidence.
The indicator to which the witness referred in his testimony was from American Institute of Real Estate Appraisers, Appraisal Indicators, The Appraiser (Yol. 38, No. 10) December 1982/January 1983 at 11. The witness said that he reviewed the data contained in that publication relating to long-term, tax-exempt bonds. From this he concluded “the cap indicates at 10% as a safe rate.” The witness then testified that the subject property would be a riskier “vehicle” for investment. He said that the subject property is not “American Telephone and Telegraph.” It is “not the United States Government.”
Following this testimony of the “safe rate” he used in determining a capitalization rate for the land, plaintiff’s appraiser testified that he then “went on to assign a residual value to the building.” He added “recapture of the improvements” as an *372 “additional component” to determine a building capitalization rate. He said, “I saw and see the marketplace, hear the marketplace, and feel that the subject ...” property, based on inspections made, had a 40-year remaining life. Accordingly, he added a 21k% recapture rate to the land capitalization rate to determine the building capitalization rate. Adding the interest component, the effective tax rate component and the recapture component, the witness concluded that 15.5702% was the appropriate capitalization rate for the building.
Based on the stipulations entered into between the parties as to land value and net operating income and the testimony of plaintiffs expert as to a land capitalization rate of 13.0702% and a building capitalization rate of 15.5702%, his income approach to value by the building residual technique may be summarized as follows:
Total net operating income $ 975,000
Income to land ($1,300,000 x 13.0702%) 169,913
Residual income to building $ 805,087
Present value of building ($805,087 15.5702%) $5,171,700
Land value 1,300,000
Total value $6,471,700
The witness also testified that he used an overall rate as a “backup” to the rates he had actually used in arriving at his opinion of the value of the subject property. This backup rate was 15%. In calculating the backup rate, the witness testified that he used “the component rate method, which is also known as the summation method, also known as a built up rate.” This rate consisted of four components. The first component was a “safe rate” of 10.5%[3] based on investments having the greatest liquidity, such as government bonds, tax-exempt municipal bonds, corporate bonds and common stocks. The second component was the “risk rate, the penalty rate and the burden of *373 management.” After some testimony on this point, including the fact that the witness lived in Holmdel “very close to American Telephone and Telegraph,” given in response to counsel’s question as to why he chose to use 1.5% “as a penalty for the risk factor,” the witness said, “I saw the marketplace, hear what the marketplace is saying, and feel the one and a half risk rate is the appropriate percentage.” The third component was 1.5% as a penalty for non-liquidity. The fourth component was 1.5% “for the burden of management of funds.” The reasons given for these latter two components were the same reasons given for the second component, the so-called risk rate. The witness then testified that he should then have added the effective tax rate of 3.0702%, but he stopped at 15% “since that number was so high already.”
On cross-examination by counsel for the municipality, when asked on what data in the real estate market he relied in choosing a 10% interest rate for his land capitalization rate, the witness said: “I drive throughout New Jersey all the time having lived here since 1962. I see the marketplace; I hear what the marketplace tells me. And I feel the marketplace indicates a safe rate at 10%.” Further questions and answers resulted in testimony that the witness relied on countless sales which indicated to him that 10% is the appropriate rate for this type of property. The witness, however, was unable to refer to even one sale on the basis of which he established the 10% rate. He also testified that, while his opinion was based on market data, he was not able to determine sufficient information from various transactions he had investigated to use any of the transactions to arrive at a rate calculated on market data.
Following cross-examination by counsel for the municipality, I asked the witness if he had any data, any facts or any information of any nature whatsoever relating to the real estate market in any location to support his rate. He referred to a property in Texas and to the appraisal indicators in the addenda to his appraisal. In addition to the excerpt from The Appraiser to which reference has already been made, the addenda also contained information from the Newsletter of The *374 Society of Real Estate Appraisers, Yol. 17, No. 23, November 24, 1982, and 12 pages from the Investment Bulletin, American Council of Life Insurance, No. 848, December 22, 1982. However, the information contained in the addenda to his appraisal does not support the witness’ opinion.
The next witness called by plaintiff was an assistant vice president of a local savings and loan association who was in charge of construction and commercial lending. He testified that mortgage interest rates in October 1982 resulted in a mortgage constant of 14.56%. The parties then entered into a stipulation that another witness would testify, if called by plaintiff, that his return on equity in the initial year of ownership of a property in Jackson Township purchased in July 1982 was 5.1%. Plaintiff then rested.
Accordingly, at the conclusion of plaintiff’s case, there was before me the opinion of plaintiff’s expert that the subject property had a total value of $6,471,700. Using that total value and the stipulated net operating income of $975,000, I calculated that the overall capitalization rate indicated by the testimony of plaintiff’s expert was 15%.[4] In addition, there was the evidence of a mortgage constant of 14.56% and a return on equity of 5.1%. Of course, plaintiff did not present any analysis of the latter two rates. However, if a capitalization rate were calculated from these two rates using a hypothetical mortgage to equity ratio of 75% to 25%, the rate would be 12.195% as follows:
75% x 14.56% 10.920%
25% X 5.1% 1.275%
Total 12.195%
This rate, together with the effective tax rate 3.0702%, equals 15.265%.
Plaintiff’s own expert had already rejected as too high any rate in excess of 15%, but I denied defendant’s motion to *375 dismiss plaintiff’s complaint for failure to overcome the presumption of correctness. Although I noted for the record that I was “rather unimpressed by the expert testimony of” plaintiff’s expert, I said that “there may be sufficient testimony before the court on the basis of which I am constrained to deny” defendant’s motion. A taxpayer has met the burden of overcoming the “presumption that an assessment made by the proper authority is correct” by the presentation of “sufficient competent evidence to overcome the presumption.” Rodwood Gardens, Inc. v. Summit, 188 N.J.Super. 34, 38, 455 A.2d 1136 (App.Div.1982), citing Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952); emphasis supplied; cf. Pantasote Co. v. Passaic City, 100 N.J. 408, 413, 495 A.2d 1308 (1985) (“The presumption in favor of the taxing authority can be rebutted only by cogent evidence____”).
II.
Defendant municipality called as its only witness an appraiser specifically engaged by it for the purpose of preparing an appraisal and testifying in this matter. He agreed that the income approach to value was the most appropriate method for valuing the subject property.
The witness first testified to a market-derived overall capitalization rate in the range of 7% to 9% based on the sales of 13 multifamily properties. The witness essentially used a yield methodology relying on analyses of prices, net operating incomes and appreciations in values. “Yield capitalization is the method an appraiser uses to convert future benefits to present value by applying an appropriate yield rate.” American Institute of Real Estate Appraisers, op. cit., supra, at 403. The method implicates the works of both L.W. Ellwood, author of the Ellwood Tables,[5] and Charles B. Akerson, who wrote *376 “Ellwood Without Algebra,”[6] to both of whose works defendant’s expert witness referred in explaining his determination of a capitalization rate. It is another method in the income approach to value, and, to that extent, may be compared with direct capitalization which “is a method used to convert a single year’s estimate of income into a value indication in the income capitalization approach.” American Institute of Real Estate Appraisers, op. cit., supra, at 387.
The rate was essentially determined from sales in communities without rent control. Only one sale was in defendant township, a rent-controlled municipality. Accordingly, the witness reviewed and analyzed in detail defendant’s rent control ordinance. The witness’ analysis of the applicable rent control ordinance indicated to him the limited nature of rental increases-to be anticipated. The effect of such rent control on the market, according to the witness, is reflected in a smaller anticipated increase in rental income and hence a smaller anticipated appreciation in market value of property. Such reduced anticipation, according to the witness, would result in a demand for a higher return on investment or a higher overall capitalization rate. He concluded that less appreciation in value would be anticipated by a purchaser of the subject property than would be anticipated by a purchaser of a property without rent control. The witness therefore adjusted the capitalization rate upward to reflect the impact of rent control on the value of the subject property and concluded that a 10% overall capitalization rate was correct. To this rate the witness added an effective tax rate for 1983 of 3.05%[7] and concluded that the overall capitalization rate applicable to the subject was 13%.
Based on the stipulated net operating income of $975,000, the application of the capitalization rate resulted in a value of *377 $7,500,000 which was the witness’ opinion of the value of the subject property as of October 1, 1982.[8]
The witness also testified that, in arriving at his opinion of an appropriate capitalization rate from the subject sales, determinations of equity dividend rates indicated a range from zero percent to four percent cash on cash return. The witness acknowledged that it is extremely difficult, on first blush, to fathom why purchasers would acquire multifamily dwellings with the inherent management burdens and high debt liabilities with such nominal rates of return. However, the witness went on to say that the application of the income approach to value has as one of its bases the principle of anticipation, a principle which is considered one of the foundations of the appraisal process. Indeed it is one of the fundamentals in the study of all value influences. "Anticipation means that value is created by the expectation of benefits to be derived in the future.” American Institute of Real Estate Appraisers, op. cit. supra, 21-22. Value is based on what the market perceives to be the future benefits of acquisition. It is this concept, according to the witness, which explains why knowledgeable investors purchase multifamily dwellings at equity dividend rates and cash flows ranging from zero percent to four percent cash on cash and, in numerous instances, negative cash flows for the early years of operation. In fact, the witness testified “that apartment houses are being bought at overall rates that are three to five percent below what the current mortgage market rates are quoted.” The witness said, “[T]he buyer of an apartment house and real estate in general is anticipating a better yield by way of other factors than just pure income.” The buyer considers, at least, general market appreciation and tax shelter benefits according to the witness.
On cross-examination the witness conceded that, based on his opinion of an appropriate mortgage interest rate, his overall *378 capitalization rate indicated a negative equity dividend return. His contention, however, was that such a negative return was market-indicated. The witness also pointed out that a negative dividend rate does not necessarily mean “a cash loss” although there might be “a significant paper loss.”
Of the three witnesses then called in rebuttal, one was the manager of the subject property. She was called to rebut the testimony of tenant turnover and anticipated increases in rental income. Actually, her testimony essentially corroborated the testimony of defendant’s appraiser on these points and thereby buttressed his conclusion that, notwithstanding rent control, overall capitalization rates derived from communities without rent control may be used for rent-controlled communities if properly adjusted to allow for the impact of rent control.
III.
In municipalities with rent control, the main dispute between the taxpayer and the municipality in a local property tax assessment matter is generally the manner in which economic rent is to be determined. See, e.g., Maple Ct. Assocs. v. Ridgefield Pk. Tp., 7 N.J.Tax 135, 143-145, 148-153 (Tax Ct.1984). There is no such dispute in this case because of the stipulation entered into between the parties that the net operating income to be used in valuing the property by the income approach as of October 1, 1982 is $975,000. Accordingly, the parties were able to focus on a capitalization rate to be used with the stipulated net operating income to determine the value of the subject property by the income approach.
In determining the appropriate capitalization rate to be used to value the subject property, I am guided by two principles. The first is that the effect to be given to an expert’s opinion is for the trier of the facts to determine. “The weight to be given to an expert’s appraisal ... depends ... especially upon the facts and reasoning which are offered as [the] foundation of his opinion.” Ocean City v. Landolfo, 132 N.J.Super. 523, 528, 334 A.2d 360 (App.Div.1975); Atlantic City v. Atlan *379 tic Cty. Bd. of Tax., 2 N.J.Tax 30, 42-43 (Tax Ct.1980), aff’d o.b. 4 N.J.Tax 685 (App.Div.1982), certif. den. 93 N.J. 250, 460 A.2d 659 (1983).
The second is that the Tax Court has the expertise to determine value and to adjudicate the correct assessment from such determination. As Judge Simpson said in Southbridge Park, Inc. v. Bor. of Fort Lee, 201 N.J.Super. 91, 94, 492 A.2d 1026 (App.Div.1985), the scope of the Appellate Division’s “review is limited to determining whether the findings of fact are supported by substantial credible evidence with due regard to the Tax Court’s expertise and ability to judge credibility. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-484, 323 A.2d 495 (1974); N.J.S.A. 2A:3A-13.” This principle was further elaborated in Glen Wall, supra. “The Tax Court has not only the right, but the duty to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question.” Glen Wall Associates v. Wall Tp., supra, 99 N.J. at 280, 491 A.2d 1247.
In applying my “own judgment to [the] valuation data submitted by [both] experts,” I find that the fair market value of the subject property for the tax year 1983 was $7,500,000, the opinion of the value of the subject property given by the municipality’s appraiser. His capitalization rate of 13% is supported by the facts and the reasoning which were offered as the foundation of his opinion of that capitalization rate “In ... inflationary times, many large investment-grade properties are being bought and sold at what seem to be extremely low rates of return, based on current income.” Sykes and Young, “A Differential Approach to Income Property Valuations: A New Measurement Technique,” 49 Appraisal Journal 214 (April 1981). This was an article dealing with anticipated rental increases. In another article in the same volume of the journal dealing with debt service coverage ratios, the author first discussed the traditional band of investment technique used in developing capitalization rates. He then noted that, as interest *380 rates started to rise, capitalization rates did not rise by the proportion of the mortgage ratio times the higher debt constant, and equity dividend rates declined. “The spendable return ha[d] become negative.” Steele, “DCR/Re Capitalization Rate Tables For Today’s Financing,” 49 Appraisal Journal 15 (Jan. 1981)
The investigative work of defendant’s expert, his facts, analysis, logic, candor and credibility were all superior to that of the expert witness and the other witnesses[9] produced by plaintiff. In fact, the testimony of plaintiff’s expert may be characterized as a meaningless litany of “I see, hear and feel the marketplace,” basically unsupported by significant facts and reasoning, after considering the totality of the evidence and comparing his evidence to that of defendant. In this regard, it should be pointed out that even though there was sufficient evidence before me at the conclusion of plaintiff’s case to overcome the presumption of correctness, overcoming the presumption of correctness is not enough for plaintiff to prevail since plaintiff has the ultimate burden of persuasion. Cf. Rumson v. Peckham, 7 N.J.Tax 539, 545-549 (Tax Ct.1985).
In reaching the result in this case, I am not unaware of the admonition given to the Tax Court by the Supreme Court in Glen Wall, supra, when it said:
The Tax Court’s decision places an onerous burden on the taxpayer and ignores the time and expense such a burden imposes on a litigant. In this day of rising litigation expenses, it is important for the courts to adopt reasonable limits on what is to be expected of a litigant in presenting its case through the use of an expert. [99 N.J. at 284, 491 A.2d 1247]
I am cognizant that local property tax cases must be viewed realistically and practically in terms of the proof required of a taxpayer. The taxpayer must, however, produce the requisite evidence to establish a right to a reduction in an assessment. The taxpayer has not produced that evidence in this case, and I do not read Glen Wall to mean that I am to hand the keys to *381 the municipal treasury to each taxpayer who walks through the courtroom door.
IV.
In the course of the trial, questions were asked concerning the sale of the subject property on August 31,1979, three years and one month before the valuation date in the present matter. The sale of the subject property was to be used as a “check” on the value determined by the income approach. Plaintiff’s appraiser testified that the total sales prices of $8,195,000 on August 31, 1979 had a cash equivalency of $5,286,299. Cash equivalency was based on an interest rate of 13%. Plaintiff’s expert did not, however, make any adjustment for time from August 31,1979 to October 1,1982. The municipality’s appraiser said that the $7,450,000 portion of the August 31, 1979 sale had a cash equivalency of $6,500,000. He then made certain adjustments for time and for the existence of rent control on October 1, 1982 and concluded that the indicated value of the subject property on that date, based on the sale, was $7,350,-000. The value, in the witness’ opinion, supported his value conclusion of $7,500,000.
In the case of Kazanchy v. Sea Bright Bor., 6 N.J.Tax 622 (App.Div.1984), the tax years 1976 through 1980 were before the court as one consolidated case. Sale of the property in that matter took place in 1978, and the court indicated that the sale should have been considered in determining value. The case was remanded for further consideration of the value of the property in light of the sale of the subject property. To the same effect is Glen Wall, supra: “[T]he Tax Court should have considered the sale of the property as an indication of true value.” 99 N.J. at 281, 491 A.2d 1247.
The sale of the subject property confirms the opinion of value of defendant’s expert.
V.
Since the subject property had a value of $7,500,000 for the tax year 1983, it is necessary to determine if that value results *382 in any change in the assessment. For the tax year 1983, the chapter 123 ratio for Jackson Township was 70%. The lower level of the common level range was 59%, and the upper level of the common level range was 81%.[10] The ratio of the current assessment to true value is 78%.[11] This ratio is within the common level range, and no change in the original assessment is indicated. Accordingly, the Clerk of the Tax Court is directed to enter judgment that the assessment for the subject property for the tax year 1983 is:
Land $ 744,000
Improvements 5,106,000
Total $ 5,850,000.

 N.J.S.A. 54:51A-6.

 The chapter 123 ratio for Jackson Township for 1983 was 70%. State of New Jersey, Department of the Treasury, Division of Taxation, Certification of Average Ratios and Common Level Range for Use in the Tax Year 1983, April 1, 1983.

 To be compared with the 10% “safe rate" previously used by the witness.

 $975,000 4- $6,471,700 = 15%.

 L.W. Ellwood, Ellwood Tables For Real Estate Appraising and Financing, (4 ed. 1977).

 Charles B. Akerson, "Ellwood Without Algebra," The Appraisal Journal, July 1970.

 The tax rate of $4,386 per $100 of assessed valuation multiplied by 69.72%. The chapter 123 rate for 1983 was 70%. See footnote 2, supra.

 The correct effective tax rate was 3.07%. If defendant's expert had accordingly used a capitalization rate of 13.07%, the indicated value would be $7,459,831.68.

 Counsel for plaintiff acknowledged that its expert's testimony was "in contradiction to" the testimony of certain of plaintiff s other witnesses.

 See citation in footnote 2, supra.

 $5,850,000 h- $7,500,000 = 78%. It is also noted that $5,850,000 h-$7,459,832 = 78.4%. See footnote 8, supra.